**Stanley STANCAVAGE, Appellant,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education and Welfare, United States of America.**

**No. 14261.**

United States Court of Appeals Third Circuit.

Argued May 7, 1963.

Decided Oct. 9, 1963.

W. J. Krencewicz, Shenandoah, Pa., for appellant.

David J. McCarthy, Jr., Dept. of Justice, Washington, D. C. (Drew J. T. O'Keefe, U. S. Atty. for Eastern District of Pennsylvania, Joseph R. Ritchie, Jr., Asst. U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN and FORMAN, Circuit Judges, and COOLAHAN, District Judge.

McLAUGHLIN, Circuit Judge.

The Secretary of Health, Education and Welfare, denied appellant's application under the Social Security Act, 42 U.S.C.A. § 401 et seq. for the establishment of a period of disability and disability insurance benefits. The district court approved that action by granting defendant's cross-motion for summary judgment. This appeal is taken from that decision.

On January 7, 1959 claimant-appellant (claimant) filed his application pursuant to Sections 216(i) and 223 of the Act, 42 U.S.C.A. §§ 416(i), 423, alleging that he had been unable to work since November 29, 1957 because of anthracosilicosis and sinus trouble. This claim was denied initially and upon reconsideration by the Bureau of Old-Age and Survivors Insurance.

Claimant then requested a hearing before a hearing examiner on the evidence of record: his request stated that he had no additional evidence to submit and waived his right to appear at the hearing. Based on the documentary evidence before him the examiner denied claimant's application on May 6, 1960. The Appeals Council denied review and this action was then filed in the district court. While the civil action was pending, however, it was remanded on motion of the Secretary for the purpose of taking additional evidence as to the extent of claimant's impairment. 42 U.S.C.A. § 405(g). On the remand the Appeals Council vacated its prior denial of review and in a lengthy and detailed opinion held that claimant was not entitled to the establishment of a disability period nor to the payment of disability benefits. The district court affirmed and granted the Secretary's motion for summary judgment.

At the time claimant filed his application he was 50 or 51 years old.[1] His formal education had ended with the third grade and although he speaks and understands Polish and English he cannot read or write either language. Claimant worked 32 years as a miner in underground anthracite coal mines until November 27, 1957, when he terminated his employment because his anthracosilicosis made it impossible for him to continue work. On December 10, 1958 he was awarded workmen's compensation by the Pennsylvania Department of Labor and Industry, effective as of November 29, 1957.

Claimant stated that he first felt shortwindedness in 1952, and in 1955 he had a bad attack of wind cut-off as a result of which he missed a week of work. From that date on he claimed that he started to miss days from work because

---

1. The date of his birth is recorded in different documents as November 10, 1908 and November 10, 1909.

of "lack of wind".[2] He complained primarily of coughing and short-windedness. The coughing, which has been present since about 1953, is most pronounced in the morning and he usually coughs up quite a bit of sputum. Shortness of breath on exertion has also been present for some time and gradually got worse so that claimant had to stop his work in the coal mines. Claimant stated that he got chest pain as well as shortness of breath on exertion, such as walking about two blocks. He said that by walking slowly on a level he can walk about two blocks, but he then has to stop because he gets "choked up" and gets a "grabbing tightening" pain. This is relieved by rest. In addition, claimant complained of severe headaches due to a sinus condition. A submucous resection and removal of nasal polyps had been performed on February 16, 1957 to correct a deviated thickened septum with nasal polyps. Some relief from the nose blockage was achieved by this operation, but claimant alleges that he still has headaches. Claimant's physical activities consist of "lying about" the house, taking one or two short walks a day in the neighborhood and watching television. He has not been employed anywhere since he left the mines nor has he sought employment.

Claimant was treated monthly by Dr. Moyer from November, 1957 until January 7, 1959. Upon his recommendation claimant was also given an X-ray examination in November of 1957 and on the basis of this examination and his own personal examination Dr. Moyer's diagnosis was anthracosilicosis and emphysema resulting in total and permanent disability, including a specific finding that claimant could not even do "light work of a general nature". Dr. Moyer also reported subjective symptoms of shortness of breath, impaired vital capacity and dyspnea from any exertion. The X-ray showed, inter alia, "diffuse, chronic, interstitial fibrosis throughout the greater portion of both lungs having a somewhat nodular and linear appearance and more or less evenly distributed." The roentgenologist's impression was "anthracosilicosis, moderate degree or second stage with some emphysema."

This same X-ray was also used in the examination of claimant by the doctor for the insurance carrier in the state workmen's compensation proceeding. Dr. Bierly's independent personal examination of claimant found "rales and coarse breathing in the bases of both lungs on deep breathing" and he concluded on the basis of this examination and the X-ray that claimant was "totally disabled from doing any work of a general nature" due to the severity of his anthracosilicosis.

Two reports were submitted by Dr. Stanulonis, who examined claimant for defendant. In the first report of January 27, 1959 he found (1) that serial electrocardiograms were within normal limits and (2) that claimant had had a history of a peptic ulcer for fifteen years. His diagnoses were coronary insufficiency and peptic ulcer. The second report, dated March 14, 1959, consisted of the results of pulmonary function studies designed to determine the degree of claimant's pulmonary impairment. He found that vital capacity (VC) was 60% of predicted vital capacity; the three second timed vital capacity (TVC) was 100% of total vital capacity; and maximum breathing capacity (MBC) was 68%. His impression was "restrictive and obstructive ventilatory insufficiency." A second series of pulmonary function tests was given claimant at government expense in July 1961 subsequent to the remand by the district court. These studies, conducted by

---

2. In checking this statement the Appeals Council found that claimant missed 7 days of work in 1956, and in the first 11 months of 1957 he worked full time during 3 months, lost 1 day of work during 4 months, and lost from 3 to 16 days of work in the remaining 4 months. The Appeals Council attributes the 16 days lost in February 1957 to the fact that "he was hospitalized that month" for nose surgery. The record indicates that claimant was discharged the day following the operation and we find no other evidence bearing on the reason he was away from work the balance of the days he lost that month.

Dr. Swartz, revealed a VC of 68!%; TVC of 95%; and MBC of 54.5%. His conclusion was that claimant had a moderate restrictive type of ventilatory defect. Dr. Swartz attributed the discrepancy in the MBC between the two tests to a failure on claimant's part to exert a maximal effort in doing the MBC in the second examination. If this factor is taken into consideration, these two studies would indicate that there was no significant progressive change in the pulmonary condition of claimant from 1959 to 1961.

The second recommended method of determining the degree of pulmonary impairment is by the use of blood-oxygen chemistry tests which measure the diffusion of oxygen and carbon dioxide through the lung walls. These studies were performed by Dr. Pytko on August 20, 1959 and November 12, 1959 and by Dr. Swartz in July 1961. Dr. Pytko concluded that his studies "tend to rule out any significant degree of impairment of diffusion across the pulmonary membrane or the presence of any significant venous to arterial shunt." His impression was that most of claimant's distress from chest pain arose from the muscular effort required to maintain adequate ventilation and not from a coronary condition. The conclusion of Dr. Swartz with respect to the blood gas studies was that they "were within normal limits".

Extensive exercise tolerance tests were also conducted by Drs. Pytko and Swartz on three separate occasions. Perhaps representative of the results of these studies is Dr. Swartz's conclusion that "the exercise tolerance test results are not remarkable and at no time during the examination was cyanosis nor marked dyspnea noted." He concluded that claimant "has a good pulmonary reserve at the present time."

Dr. Swartz' diagnosis based upon chest X-ray examination of claimant was "anthracosilicosis early third stage". The final impression that Dr. Pytko found on the basis of his complete examination was "anthracopneumoconiosis, with grade IV dyspnea, functional classification 3 to 4, therapeutic classification B." Finally,

an optometrist's report, dated January 12, 1960, indicates that claimant has a corrected vision of 20/70 bilaterally.

In summarizing the evidence relating to the extent of claimant's impairment:

"The Appeals Council agrees that from all of the evidence now of record, it may be concluded that the claimant's principal impairment is a moderately advanced anthracosilicosis. However, it is clear that this condition is not of such severe degree as to preclude all work. Probably the most significant items of evidence are the ventilation studies, the reports of blood chemistry studies and the various exercise tolerance tests. On the results of the ventilation studies and the blood-chemistry, Dr. Swartz concluded that the claimant had a good pulmonary reserve. He showed neither cyanosis nor marked dyspnea following the exercise tolerance test given at that time and the same was true on an exercise tolerance test given in August 1959. It is significant that when the claimant was exercised on a stationary bicycle in November 1959, Dr. Pytko reported that the blood oxygen saturation remained within normal limits. Almost two years later, in July 1961, Dr. Swartz also reported that the oxygen content of the arterial blood and carbon dioxide content of the venous blood were normal both before and after exercise. These tests would indicate that a sufficient supply of oxygen is reaching the blood stream."

■■ The law is well settled that at this stage "[o]ur duty is to determine whether the court below was correct in holding that there was substantial evidence in the record to support the finding of the [Appeals Council] that [claimant] was not precluded by his physical condition from substantial gainful activity. * * * As was stated * * * in Klimaszewski v. Flemming [D.C.], 176 F.Supp. 927, 931 (1959), 'The test for disability consists principally of two

parts: (1) a determination of the extent of the physical or mental impairment and (2) a determination whether that impairment results in an inability to engage in any substantial gainful activity'." [3]

■ Our independent examination of the many varied and extensive studies conducted on claimant leaves no doubt that there is substantial evidence to support the findings of the Secretary as to the extent of claimant's physical impairment. The opinion of Dr. Moyer that claimant was totally and permanently disabled simply cannot be reconciled with the more specialized clinical studies that were performed in addition to the chest X-rays.

We have more difficulty with the second part of the test for disability, however, for the only reference to claimant's occupational capacities are the statements of Dr. Moyer and Dr. Bierly that claimant was "totally and permanently disabled", cannot do "light work of a general nature" and "is totally disabled from doing any work of a general nature." These conclusions, of course, must be discounted to some degree because they are correlated to a view of the medical evidence that finds claimant's impairment to be more severe than that supported by the accepted evidence. However, we note that there is no other opinion on this point to aid the Appeals Council (and this court) in reaching a fair assessment of what claimant can do.

The Appeals Council concluded from its analysis of the medical evidence that:

"It is apparent that with his residual capacities [claimant] should be able to engage in work requiring light or moderate exertion. It is appreciated that the claimant has had only a third grade education; however there are many types of work in our economy that are light or sedentary in character and require only minimal education. For example, a study made by the U. S. Department of Labor, Bureau of Employment Security, entitled 'Estimates of Worker Trait Requirements for 4,000 Jobs as Defined in the Dictionary of Occupational Titles,' lists 221 jobs that can be performed by persons with minimal education, and that are either sedentary in character or require light exertion only. Of these 221 jobs, 45 were of the type that can be done after a mere demonstration to the employee, and the balance can be performed after demonstration and approximately 30 days of training. The record establishes that the claimant retains his intellectual faculties, hearing, manipulative capacities, and mobility, and that he has fairly good eye sight on correction (with glasses). Although he has had only a third grade education, he has been able to perform the duties of an occupation requiring many skills for the major part of his working life. There is therefore no reason to doubt that with his residual capacities and acquired skills, he could now engage in work requiring less demands than in his former occupation."

■ We recognize that the use of governmental and industrial studies such as the one referred to by the Appeals Council in the present case has been permitted without objection on occasion [4] and approved of [5] as warranting the Secretary's determination of what employment opportunities are available to a claimant. Having in mind the sincere, practical administration of the Act, however, we are not persuaded that such evidence moves far enough away from the realm of conjecture and theory when applied to the facts before us. It is too much akin to

3. Hodgson v. Celebrezze, 312 F.2d 260, 262–263 (3 Cir., 1963); Farley v. Celebrezze, 315 F.2d 704 (3 Cir., 1963).

4. Graham v. Ribicoff, 295 F.2d 391 (9 Cir., 1961).

5. Pollack v. Ribicoff, 300 F.2d 674 (2 Cir., 1962); Rinaldi v. Ribicoff, 305 F.2d 548 (2 Cir., 1962).

the employment Hodgson was supposed to be able to secure as an elevator operator.[6] The suggestion that there is a list of "221 jobs that can be performed by persons with minimal education and that are sedentary in character or require only light exertion" is not very meaningful. There must be something more tangible establishing what employment opportunities there are for a man with his impairment. The failure of the Secretary to establish the existence of that kind of genuine employment opportunity is patent. And it must be presumed that the best available proof on this has been presented. That proof is unacceptable under Hodgson.

The judgment of the district court will be reversed and the case remanded thereto with direction to that court to enter judgment in favor of the claimant and to take such other steps, directly or indirectly, as may be necessary to determine the period of disability and the disability benefits to which claimant is entitled in accordance with this opinion.

6. Hodgson v. Celebrezze, supra.