Charles LEMIN

v.

Robert H. FINCH, Secretary of Health, Education and Welfare.

Civ. A. No. 69–2318.

United States District Court,
E. D. Pennsylvania.

Feb. 19, 1971.

Joseph A. Zane, Schuylkill Haven, Pa., for plaintiff.

L. C. Bechtle, U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

TROUTMAN, District Judge.

This action is brought under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. The final decision in this case is that of the Appeals Council dated August 5, 1969, denying the plaintiff's request for the review of a decision rendered by the hearing examiner on May 20, 1969, in which the examiner denied the plaintiff benefits under Section 216(i) and Section 223, respectively, of the Social Security Act, as amended.

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g). This Court has no authority to hear the case *de novo*. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964); Mauldin v. Celebrezze, 260 F.Supp. 287 (D.C.S.C.1966). The question here involved, therefore, is whether there is substantial evidence to support the Secretary's decision. To answer this question, it is the duty of this Court to look at the record as a whole. Boyd v. Folsom, 257 F.2d 778 (3rd Cir. 1958); Klimaszewski v. Flemming, 176 F.Supp. 927 (E.D.Pa.1959).

The test for disability consists principally of two parts: (1) a determination of the extent of the physical or mental impairment and (2) a determination whether that impairment results in an inability to engage in sub-

stantial gainful activity. Stancavage v. Celebrezze, 323 F.2d 373 (3rd Cir. 1963); Klimaszewski v. Flemming, *supra*, 176 F.Supp. at page 931.

■ "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It must be enough, if the trial were to a jury, to justify a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. If there is only a slight preponderance of the evidence on one side or the other, the Secretary's finding should be affirmed. Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962).

■ There are four elements of proof to be considered in making a finding as to plaintiff's ability or inability to engage in any substantial gainful activity. They are: (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) plaintiff's age, educational background, and work history. Dillon v. Celebrezze, 345 F.2d 753, 755 (4th Cir. 1965); Thomas v. Celebrezze, *supra*, 331 F.2d at 545; Underwood v. Ribicoff, *supra*, 298 F.2d at 851.

We proceed to a consideration of the *entire* record to determine whether there is substantial evidence to support the Secretary's decision that the plaintiff is not entitled to disability insurance benefits. (P. 19)

At the hearing held on May 15, 1969, the plaintiff, Charles Lemin, testified that he was born in 1915 (p. 29), making him approximately fifty-five years of age. He quit school after completing the fifth grade and before completing the sixth grade at sixteen or seventeen years of age. (P. 30) That he had not completed the sixth grade at sixteen or seventeen years of age strongly indicates that this individual is not mentally adaptable to new and unfamiliar assignments. As previously indicated, his educational background is a factor which must properly receive consideration in determining the validity of his claim. Dillon v. Celebrezze, *supra*; Underwood v. Ribicoff, *supra*. After leaving school, he then painted fences "and stuff like that" until he went into the coal mines where he was employed for a period of approximately twelve years, hand-loading coal. (PP. 30 and 31) He did nothing else except the hand-loading of coal to the time when he left the mines, but then later returned for a period of approximately sixteen months when again he hand-loaded coal. (P. 31) When employment in the mines became difficult to obtain, he left the mines and joined his brother "in the city" where he obtained work with a concrete burial vault company as a truck driver, but principally as a laborer, hauling concrete and handling and delivering vaults. (PP. 31 and 32) At the suggestion of his Draft Board he then obtained employment with a gear manufacturing company where he was employed for approximately two years and was thereafter employed by the Mammoth Product Company operating a punch press and turner, lathe and grinder and where he also did laboring work, moving bolts and nuts from one place to another. (PP. 32 and 33) He was so employed moving bolts and nuts "from one place to another" until April 1959 when he was told by one of his superiors that he was not doing a very good job. (P. 33) According to the plaintiff, his superior stated "they tell me you get dizzy spells at the machine and I think (the thing) for you to do is to quit altogether". Plaintiff conceded that he had been suffering from dizzy spells and that he would "black out". (P. 33) Accordingly, at the direction of his superior, the plaintiff quit his employment and was given a check by his employer "to bring me back to Pennsylvania". (P. 33) He has not worked since that time (P. 34).

The plaintiff testified that in addition to dizzy spells and black-outs he suffered from pains in his stomach and in his chest as a result of which he would sometimes "double up with pain". (P. 34) He was hospitalized and found to be suffering from a peptic ulcer. (P. 35) This condition existed as early as 1958 (P. 35) and as the record will subsequently indicate, he apparently also was concurrently suffering from a chest condition which is later detailed in the record. As early as 1960 he suffered from pneumonia, (P. 35) and on one occasion "almost bled to death" by reason of the peptic ulcer. (P. 35) Although he was earning $2.83 per hour while employed until 1959, (P. 45) he was, upon ceasing his employment, obliged to go on public assistance or welfare. (P. 45) By reason of the fact that he was on public assistance or welfare, he was, when hospitalized and treated from time to time under the Public Assistance program, under the care of a different physician on each occasion and this by reason of the fact, as he explained it, that when on public assistance "you go to whatever attending doctor is on". (P. 41) Thus, on each occasion when his physical condition forced him to obtain medical care and treatment, he was treated by a different physician. On each of such occasions he was treated for the specific complaints which were particularly acute at the time and little or no attention was paid to his condition generally or to symptoms from which he may have suffered chronically. Thus, by reason of his impecunious status, the record leaves much to be desired from the standpoint of qualified medical opinions as to his condition commencing in 1959 and extending through 1963 [1] and to the time of the hearing before the Examiner in 1969.

Of the several physicians, who saw the plaintiff on specific and isolated occasions as a public assistance patient and who treated him for specific complaints which were then acute, *only one* saw and treated the plaintiff over an extended period of time from 1963 to 1969. He was, according to the plaintiff's testimony, Dr. C. L. Eisenberg, who was treating the plaintiff at the time of the hearing before the Examiner on May 15, 1969.

"Q. Are you being treated by a physician now?

A. Oh Yes.

Q. Who?

A. C. L. Eisenberg."

(P. 36)

According to Dr. Eisenberg, he first treated the plaintiff in 1963. (P. 127) According to Dr. Eisenberg the plaintiff's illness, from whatever cause, first occurred or began in 1958 and forced the plaintiff to cease work in 1959.[2] (P. 127)

Whether because of his lack of education or because of the failure of the doctors to have confided in him, the fact remains that the plaintiff fails in testifying in his own behalf to accurately describe his physical condition. For example, he suggests that Dr. Eisenberg was treating him for "ulcer and emphysema", (P. 36) whereas Dr. Eisenberg's findings indicate extreme nervousness, wheezing, pain in the stomach, nausea, shortness of breath and rattling in the chest. He suggests a duodenal ulcer, pulmonary emphysema, bronchospasm, and anxiety state, chronic, severe. (P. 127). Whatever understandable deficiencies may exist in the plaintiff's testimony, as it would support his claim, the fact is that he is and has been tak-

---

1. September 30, 1963 becomes a crucial date because it was on that date that the plaintiff last met the special earnings requirements of the act so that it is his physical condition on September 30, 1963 which is controlling as to his eligibility for benefits.

2. Dr. Eisenberg's findings will be discussed at greater length in connection with our subsequent treatment of the medical findings generally as they appear in the record.

ing a series of medications and drugs indicating the existence of a nervous condition along with the ulcerous condition and accompanied by an emphysematous condition of the chest resulting in severe shortness of breath. (PP. 36 and 37) His condition since 1959 has been described by the plaintiff as follows:

"Q. When you stopped working in April '59, did you ever attempt to get lighter work of some kind?

A. I couldn't seem to do anything at all.

Q. What have you been doing since then?

A. I haven't done anything, now I can't do anything at all, I haven't done anything but sit around, watch television or something because I wasn't able to walk around, I couldn't breathe if I would walk around.

Q. That's lately you mean?

A. No, it was that way ever since '59.

Q. You were short of breath then?

A. Yes, but I went along with the doctor, the doctor who told me, just when I would walk into his office from the car I would be coughing something awful and I would tell him and he said 'well it must be the pressure from your stomach, it will put pressure in your lungs and that's the reason you can't breathe.'

Q. You didn't work for ten years?

A. That's right.

Q. Have you been maintaining yourself?

A. I have been on assistance, that's all I could get.

Q. What does it amount to now?

A. I receive $123 every two weeks.

Q. Twice a month?

A. Yes, and it isn't very much when you're paying $60 a month rent.

\*      \*      \*      \*      \*      \*

Q. How about the things around the home? Are you able to do anything?

A. I am not able to do anything around the house at all.

Q. How now or then?

A. Well I haven't been since '60 anyway, I haven't been able to do anything around the house; the worst of the time when I would go out and try to do a little garden in the back '59 or '60 I would sit down flat on the ground and try to pull weeds or something out of the garden, but I got to the point where I couldn't even do that anymore.

Q. On account of the shortness of breath?

A. That's right.

Q. Do you drive a car?

A. Not anymore.

Q. When was the last time?

A. Oh the last time I drove a car was '65 I guess. I could drive in '65 but not very much."

(PP. 37, 38 and 39)

He further testified:

"Q. How many rooms do you have?

A. Oh seven.

Q. Two stories?

A. Yes, but I only live on the first floor myself; I have my bedroom on the first floor, my bathroom on the first floor; I can't go upstairs."

(P. 30)

He explained as follows the reason for the treatment by multiple physicians:

"Q. You haven't seen Dr. Whitsel?

A. No I have not.

Q. He treated you at the hospital in '65?

A. Yes.

Q. He was your former doctor?

A. No, he will not treat you on an assistant plan, but they have a doctor once every month, they change doctors, attending doc-

tors in the hospital you know, and that is how he comes to me in the hospital, because he was the attending doctor at the time, but on assistance you go to whatever attending doctor is on."

(P. 41)

Since 1958, although he has been completely inactive, he has lost approximately thirty pounds. (P. 42) His trouble seems to have commenced with a hospitalization in 1958, following which he went back to work and attempted to work and apparently did work, in a manner unsatisfactory to his employer, until 1959. (P. 43) His difficulties as early as 1958 and 1959 consisted of dizzy spells, black-outs and pain "in my chest" which would cause him to "double up". (P. 43) These pains would sometimes start in the stomach and extend up into his chest. (P. 43) As early as 1958, he had trouble breathing and continued to worsen through 1958 and 1959 and thereafter so that he was unable to walk any distance as early as 1959 and continuing through 1963 and thereafter.

"Q. Did you have any trouble with your breathing?

A. I did have trouble with my breathing at that time, yes.

Q. Did you complain to the doctors at that time?

A. Yes, I did complain.

\* \* \* \* \* \*

Q. Did your breathing difficulties get any better from '59?

A. No, it got continuously worse.

Q. Were you able to do any walking for any distance in that period?

A. Between '59 and '63—no."

(P. 43)

As early as 1962, he "couldn't walk no distance at all" and at the time he testified he could "hardly walk across the room".

"Q. What would happen if you would walk for any distance?

A. Well I just can't get my breath at all, I couldn't at that time. I could get it a little better than now because now I can't hardly walk across the room.

Q. But in '62 and '63 you couldn't walk?

A. No I couldn't walk no distance at all."

(P. 44)

He can do no lifting.

"Q. Can you do any lifting?

A. I can't do any lifting at all.

Q. What kind of heat do you have at home?

A. We have a coal furnace.

Q. Who takes care of the coal and ash problem?

A. Well the two boys, I have two fifteen year old boys who do that."

(PP. 44 and 45)

The conditions from which he suffered as early as 1958 and 1959 have continued to get consistently worse.

"Q. These conditions that you have or rather that you had in '58 and '59, did they get any better or did they get progressively worse?

A. They have gotten worse.

Q. Do you feel, whether you could have gone to work in 1963, say prior to September 30, '63?

A. I couldn't have.

Q. You could not have?

A. No, I couldn't have.

Q. If you were physically able would you have liked to have gone?

A. I certainly would.

Q. Did you feel that you would like to be the bread winner in your family and support your family?

A. Yes."

(PP. 46 and 47)

The plaintiff does not appear, from the record, to be the type of individual content to malinger, allow his wife to work and accept public assistance. On the

contrary, with some indication of ambition, he left the mines in 1940 and proceeded to the city to obtain employment which would better his status and condition. (P. 31) His wife has testified that he adequately supported the family until 1959 when he ceased work because of his physical condition. (P. 48) She stated that he began having serious difficulties with his health in 1958 when occasionally he would double up in pain and the doctor would give him a "shot" and he would go back to work. His condition at that time was not diagnosed because the plaintiff did not want to go into the hospital because "he didn't want to lose any work". (P. 48) As early as 1958 and 1959, he complained of dizziness and blackouts and became "real bad" when he went to the hospital in 1958. (P. 48) Prior to his break-down in health, he was active around the house, did the chores, assisted in taking care of the children, and it was not until 1959 when he had what his wife describes as "serious attacks" that he wasn't able to "do anything" and she "had to lead him around". All this was prior to 1963.

"Q. That was before '63, is that correct?

A. Yes.

Q. Why did you have to lead him around and help him around?

A. Because he was so dizzy he couldn't seem to walk. He went down to 117 pounds and he had stomach trouble, pain in his stomach."

(P. 49)

Since 1959 his condition has worsened. (P. 49) Between 1960 and 1963 she described his condition as follows:

"Q. Can you tell us about his—the difficulty he had in breathing between years of '60 and '63?

A. Well he was awfully short of breath, he could not walk.

Q. If he walked for any distance how would he react?

A. Well he would start puffing for his breath you know, he couldn't walk any distance. The boys they wanted him to go hunting with them and he couldn't do it.

Q. Did he hunt before he had this difficulty?

A. Yes he used to hunt before.

Q. Did he like to hunt?

A. Yes, he did.

Q. In other words he hasn't been able to do any hunting since 1959 and 1960?

A. Yes, that is right."

(P. 50)

Reverend John G. Bethune was familiar with the plaintiff's condition in 1964 and described him as "sickly and gasping for breath and using medication". (P. 52) The plaintiff sometimes became ill in church and had to be removed. (PP. 52 and 53) Reverend Bethune described the condition as "shortness of breath, hard breathing" and "pains about the chest". (P. 53) The "gasping for breath" was described as "frequent". The plaintiff was not a member of Reverend Bethune's church. (P. 52) Such description of plaintiff's condition in 1964, received from an impartial source, is some indication of his condition in 1963.

It was stipulated that Milton Lemin, plaintiff's son, would have testified, if called, in corroboration of the testimony of the plaintiff, his wife and Reverend Bethune. (P. 54)

We have bothered to review the lay testimony in detail because in it we find a continuity which, with one exception, is lacking in the medical evidence.[3] Con-

3. By reason of the fact that he was on public assistance, plaintiff was treated on each occasion by a different physician and particularly the physician who was on that date assigned to public assistance patients. Thus, as we shall subsequently show, the medical reports, with one exception, lack that degree of continuity necessary to the establishment of the plaintiff's physical condition on September 30, 1963, based upon medical reports of 1965 and thereafter submitted at a hearing held in 1969.

tinuity becomes important because of the problem of establishing the plaintiff's condition on September 30, 1963, by way of subsequent medical examinations, treatment and reports submitted by doctors acting in connection with the welfare and public assistance program of the Commonwealth. The difficulty existed from the very inception of the case by reason of the fact that plaintiff, without the benefit of counsel, first filed an application for benefits on October 3, 1965 (pp. 78–81). It was then that he first learned of changes in the regulations which permitted his filing a claim for benefits.

> "Q. You applied for disability as soon as you learned that the requirement was changed from age 50, is that correct?
>
> A. That is right."
>
> (P. 45)

In that application for benefits, the plaintiff referred to stomach ulcers and asthma as the conditions which disabled him. The face of the application hardly suggested the existence of conditions which would cause total disability. (P. 78) The claim was apparently disallowed and a request for reconsideration was filed by the plaintiff on February 15, 1966. (P. 84) Upon reconsideration, (pp. 85 and 86) the plaintiff was again denied benefits. Apparently, the record at that time was incomplete because in so deciding the following was noted: " * * * There is no evidence that your nutrition was disturbed or that you had any serious weight loss"; "there is no evidence that your breathing impairment was so severe as to prevent you from engaging in regular daily activity"; "the evidence does not establish therefore that you had any impairments severe enough to have prevented you from doing some type of substantial gainful work at a time when you still met the earnings requirement".

Obviously, the present record is quite to the contrary. A weight loss of approximately thirty pounds has been established. That the claimant is on a diet has been established. That he has had breathing impairment and in fact is in most instances gasping for breath has been established. Thus, the original determination and reconsideration of the claim was apparently based on an incomplete and insufficient record.

Upon denial of benefits, plaintiff, again without the benefit of counsel, filed another application on April 10, 1968, (pp. 87 to 90). Here, he referred to "emphysema, chronic stomach ulcers" as the cause of his disability. (P. 87) On the basis of this application and without any further evidence, benefits were again denied. (PP. 91, 92) Upon reconsideration and without further or additional evidence, the same result was reached. (PP. 95, 96)

As early as November 17, 1965, plaintiff, on interview, advised of shortness of breath occurring first in 1958, stomach trouble and frequent black-outs as a result of which plaintiff advised that his employer was afraid that he, the plaintiff, would fall into a machine. (P. 97) Plaintiff advised of hemorrhages of the stomach, hospital visits, medicines, nerve sedatives, inability to negotiate the stairs and inability to tie his shoes. (P. 98) It was noted by the interviewer that plaintiff had difficulty in walking and breathing, that he was "very short of breath and walked as though in pain" and that his "general appearance indicates extreme illness and weakness". None of these disclosures are alluded to on either the consideration or reconsideration of the plaintiff's application. Either they were overlooked, ignored or disbelieved. The record indicates no justification for either or any of such possibilities. Further contact with the plaintiff on February 15, (1966) revealed a worsening lung condition to the point where plaintiff was "coughing up blood at times and can't clear lungs at all". (P. 101) At that time he coughed frequently producing a "deeply reddish" sputum and appeared to be walking "stooped-shouldered". (P. 103) Again no reference is made to these conditions

in either the consideration or reconsideration of the plaintiff's application.

Excerpts from the records of the Department of Public Assistance placed in the records (p. 109) confirm the existence of an ulcer and the occurrence of black-outs as early as March 10, 1959, hospitalization of the plaintiff as early as December 3, 1958, in Cleveland, the existence of "bad lungs" and inability to walk up and down the street because of lack of "wind due to asthma" as early as August 28, 1961, the existence of a nerve condition as early as August 13, 1963, and severe shortness of breath and dizziness upon walking a short distance as early as March 31, 1964. The recorded and documented deterioration of the plaintiff's condition commencing in 1958 and continuing through 1963 and thereafter is nowhere referred to in the several denials of plaintiff's application and for the first time is alluded to in the Examiner's most recent decision of May 20, 1969, (p. 11) but only after the claim has twice been denied initially and twice been denied on reconsideration and only after the retention of counsel by the plaintiff and counsel's insistence that a complete record be created and considered.

The records of the J. C. Blair Memorial Hospital confirm the plaintiff's hospitalization at that institution as early as May 1961, and his subsequent hospitalization in July 1965. Said records confirm the existence of shortness of breath "for several years" with wheezing and rattling in the chest and vomiting of blood. (P. 110) The existence of emphysema was likewise confirmed. (P. 111) The discharge summary was signed by Dr. Theodore D. Whitsel and contained the following diagnosis: "Duodenal ulcer with hemorrhage. Pulmonary emphysema with bronchospasm. Anxiety state, chronic, severe." It also contained a concluding paragraph as follows:

"In answer to a query from the Assistance Department, I would indicate that he is physically quite capable of work although I doubt he is employable on the basis of his personality and willingness."
(P. 111)

It is upon this 1965 discharge summary that the Examiner principally relies in arriving at his conclusion as to the plaintiff's condition on September 30, 1963. Oddly, the Examiner makes scant reference and in some instances no reference to the hospital records pertaining to the plaintiff's hospitalization in May 1961, June 1961, February 1963, and March 1963.

Referring first to the May 1961 hospitalization, the plaintiff, upon discharge, was suffering from the effects of an acute duodenal ulcer and hypertension with arteriosclerotic cardiovascular disease. (P. 112) In Dr. Whitsel's 1965 discharge summary, he refers to the 1961 hospitalization at the same hospital, refers to the duodenal ulcer, but make no reference whatever to hypertension and arteriosclerotic cardiovascular disease. Neither does the Examiner make any reference whatever thereto in his detailed findings and extended report. Since the 1965 summary discharge was based in part on the 1961 hospital records, it necessarily follows that a very substantial finding noted by Dr. Patterson was either ignored or overlooked by Dr. Whitsel in preparing the 1965 summary and was ignored or overlooked completely by the Examiner. Thus, a very substantial condition obviously tending to affect the plaintiff's ability to work has been completely overlooked. This is difficult to understand in the light of the fact that Dr. Whitsel in the 1965 summary, in referring to the 1961 hospitalization, and after making reference to the duodenal ulcer, said: "Dr. Beck at that time specifically noted that he was not particularly cooperative". (P. 110) However, that is not what Dr. Beck said. What he in fact said, after referring to the condition above mentioned was, "Prognosis guarded—due to low intelligence and poor cooperation". (P. 116) "Low intelligence" may well ac-

count for what a sophisticated medical man may consider "poor cooperation". Moreover, it may well indicate an overlying or underlying psychiatric or personality problem accounting for the plaintiff's inability to work. In any event, there is little excuse for hand-picking from the 1961 hospital entries only part of a notation made by Dr. Beck which part operates against the plaintiff and ignoring not only the balance of the notation, but other notations made by Dr. Patterson with reference to hypertension and cardiovascular disease which operate in favor of the plaintiff. In any event, he was not Dr. Beck's patient. He was Dr. Patterson's patient. (P. 112, line 7) It was Dr. Patterson who signed the discharge, (p. 112) who signed the personal history, (p. 113) to whom Dr. Ayella, radiologist, submitted the X-ray reports (p. 115) and nowhere does either Dr. Patterson, Dr. Ayella, or any other physician who contacted the plaintiff, make any reference to his lack of cooperation. It was only in connection with the June 1961 hospitalization that the plaintiff, as a public assistance patient, was, like a billiard ball, bounced from Dr. Patterson to Dr. Dunn to Dr. Beck, that the latter made the notation in question which Dr. Whitsel, in 1965, refers to only in part and upon which the Examiner, in 1969, relies heavily. The 1963 hospitalization was again under the care of Dr. Patterson and was for the limited purpose of treating a pneumonitis of the left lower lobe, (p. 122) a condition from which emphysema victims not infrequently suffer. X-ray reports confirmed the existence of the condition (p. 126) and no effort was made, and none intended, to treat the plaintiff for the cardiovascular condition, the emphysematous condition or the other conditions from which the plaintiff suffered. To pick and choose and present parts of entries from the 1961 records substantially lessens the value of the 1965 summary submitted by Dr. Whitsel and upon which the Examiner so heavily relies.

Worse than the use of only portions of the record by Dr. Whitsel is the use by the Examiner of only a portion of Dr. Whitsel's statement. The doctor stated: " * * * I doubt he is employable on the basis of his personality and willingenss". (P. 111) The Examiner, referring to Dr. Whitsel's report, says in one instance that Dr. Whitsel "doubted the claimant's willingness" (p. 12) and in another instance that Dr. Whitsel "questioned the claimant's willingness". (P. 14) What Dr. Whitsel in fact stated was that he doubted that the plaintiff was able to work because of his "personality and willingness". The reference to "personality" was, by Dr. Whitsel, his idea of a discreet manner or method in which to make reference to the "chronic and severe anxiety state" diagnosed by Dr. Eisenberg (p. 137) who treated the plaintiff since 1963. (P. 127) Thus, by eliminating Dr. Whitsel's reference to "personality", the Examiner thus eliminated reference to plaintiff's "anxiety state" and thus completely misconstrued and misinterpreted the basis for Dr. Whitsel's doubts as to the plaintiff's employable status.

In still another instance the Examiner misinterpreted the record to the plaintiff's detriment. After calling and qualifying a vocational expert, the Examiner asked of him a hypothetical question as follows:

"Q. Will you consider his work experience, his education at the time, in the period in which we are concerned on and prior to September 30, 1963, assuming that he had impairments diagnosed as as duodenal ulcer with *moderate* symptoms at that time, emphysema, resulting in shortness of breath, there is no medical evidence in file as to the degree, the severity of the emphysema at that time, but there is no evidence showing that it is more than *moderate* in degree, and he also had and continues to have a depressive anxiety state of *moderate* degree, and will you also assume that he can no longer engage in heavy or arduous work.

In your opinion are there any other types of work in which he could engage?"

(PP. 58 and 59. Emphasis ours)

Based upon the record, said hypothetical question is substantially inaccurate in the following respects:

1. Nowhere in the record is it suggested that the symptoms of the duodenal ulcer are "moderate". On the contrary, there is evidence of vomiting, nausea, tarry stools, and pain in the abdomen sufficient to cause the plaintiff to "double up", dizziness, black-outs, etc. Dr. Whitsel, who tends to minimize the plaintiff's symptoms, refers to the condition as "duodenal ulcer with hemorrhage". (P. 111) Dr. Patterson refers to it as "duodenal ulcer acute". (P. 112) Dr. Eisenberg refers to it as "duodenal ulcer, chronic". (P. 137) Nowhere in the record do the medical specialists refer to the ulcer as "moderate" and the lay testimony indicates quite to the contrary. Experts interviewing the plaintiff on behalf of the Department, refer to his appearance as one of "extreme illness and weakness". (P. 100) Others refer to him as "a very pale sickly-looking man". (P. 107)

2. Nowhere in the record is it suggested that the symptoms of the emphysema are "moderate". On the contrary, there is at least some evidence that it is in the "last stage". (P. 42) Dr. Whitsel refers to wheezing and rattling in the chest. (P. 110) Dr. Eisenberg does likewise. (P. 127) Reference is made in the record to coughing with some blood in the sputum (p. 103), to shortness of breath (p. 100), to plaintiff's inability to tie his shoes and negotiate the stairs (p. 98) and symptoms of greater severity described by the plaintiff himself and his wife. Such testimony does not, of course, demonstrate the degree of the emphysema. Neither does it justify the description thereof as "moderate" by the Examiner and the assumption of that as a fact by the vocational expert.

3. Nowhere in the record is it suggested that the symptoms of the anxiety state from which the plaintiff suffers are "moderate". On the contrary, it has been described by Dr. Eisenberg as "chronic and severe". (PP. 127 and 137) The Examiner's rejection of Dr. Eisenberg's testimony does not justify his asking the vocational expert to assume facts not supported by the record.

For the reasons stated we do not consider the testimony of the vocational expert competent for the purposes for which he was called. It is noteworthy that he admitted that unless he assumed that the symptoms were, in each instance, "moderate" his conclusions would be quite to the contrary. (PP. 61, 62, 64, 66, 68 and 69) We cannot accept the description of the symptoms in question as "moderate" and therefore cannot accept the conclusions of the vocational expert based upon such assumptions.

Reviewing the referee's decision we find the following: *"Of particular significance in this case,* is the claimant's own admission to the Department of Public Assistance on August 13, 1963 (Exhibit 15), less than two months prior to the date on which he last met the special earnings requirements of the Act, that he could do light work, but that none was available in his area". (P. 14) A reference to Exhibit 15, (p. 109) discloses that it is a series of excerpts, somewhat like docket entries, taken from the files of the Bureau of Public Assistance. It is unsigned and uncertified. It discloses nothing as to the identity of the individual who made the entries. It discloses nothing as to the identity of the individual who may have interpreted the entries, and the particular item or entry to which the Examiner refers is that of August 13, 1963, as follows: " * * * Mr. Lemin expressed feeling he could do light work but none seems to be available in his area". (P. 109) This does not quote the language used by the plaintiff. It says that the plaintiff "expressed (the) feeling". How did he express it? What language, what words did he use? Was his language the subject of misinterpretation by the person who conversed with the plaintiff and made the

entry in question? It is not a quote of what the plaintiff said. It is an interpretation or misinterpretation by an individual unnamed and unidentified of what the plaintiff "expressed" by way of his "'feeling". The suggestion that this is "of particular significance in this case" (p. 14) demonstrates the extent to which the Examiner appears to have engaged in a studied course designed to minimize and sometimes completely ignore information favorable to the plaintiff and exaggerate information damaging to the plaintiff's cause.

In similar manner, the Examiner completely rejected the statements submitted by Dr. Eisenberg. He did so because he concluded that Dr. Eisenberg's opinion, that the plaintiff was and is totally and permanently disabled, "is not supported by his own findings". (P. 15) He suggests that Dr. Eisenberg's conclusions are upsupported by clinical and laboratory diagnostic techniques. (P. 15) However, Dr. Eisenberg made specific reference to the hospital records and the entries thereon pertaining to the plaintiff's hospitalization in May of 1961, June of 1961, and February of 1963. The Examiner, as we have already shown, has elected to refer to certain isolated entries in such records, and portions thereof, to minimize the plaintiff's cause and apparently now rejects the records in their entirety for the purpose of considering the opinion of Dr. Eisenberg based thereon. We cannot accept anything less than an impartial analysis of the record, and if the conclusions of Dr. Eisenberg cannot be accepted because they are "unsupported by medical and laboratory diagnostic techniques" (p. 15) then how can the conclusions of Dr. Whitsel (pp. 110 and 111) be accepted on the record before us. In addition to the testimony of Dr. Whitsel, there is, of record, nothing more than the discharge summary prepared by him following the plaintiff's hospitalization in July 1965. No hospital notes and no copies of hospital records pertaining to the 1965 admission are in the record. On the contrary, as to the 1961 and 1963 admissions

copies of the original hospital notes are in the record from which can be ascertained the tests which were made, the results of those tests, and the facts, medical or otherwise, upon which a physician may base a conclusion. No such notes with respect to the 1965 hospitalization are in the record, yet Dr. Whitsel's conclusion is accepted by the Examiner and that of Dr. Eisenberg rejected.

This becomes even more difficult to understand, in the light of the fact that Dr. Eisenberg has been the plaintiff's attending physician, when the plaintiff could afford it, and when he was not under the care of various physicians to whom he was assigned by Public Assistance. Dr. Eisenberg is the only medical witness who saw the plaintiff in 1963 and the only witness who can attest to the plaintiff's physical condition in 1963 and more particularly on September 30, 1963. He not only states his conclusions (pp. 127 and 128) but very fairly refers to the hospital reports of the J. C. Blair Memorial Hospital. These reports are in the record (pp. 112 to 126) and, therefore, afford basis upon which to analyze the validity of Dr. Eisenberg's conclusions. On the contrary, Dr. Whitsel's conclusions (pp. 110 and 111) permit of no such analysis because of the absence of the hospital records as to the 1965 hospitalization upon which Dr. Whitsel bases his report or summary. Therefore, we cannot justify the Examiner's acceptance of Dr. Whitsel's conclusions and his rejection of Dr. Eisenberg's conclusions. Moreover, Dr. Whitsel's conclusions are subject to a further objection in that he saw plaintiff only in 1965 and not at all in 1963. Dr. Eisenberg not only saw the plaintiff professionally in 1963 and thereafter, but was familiar with the results of plaintiff's hospitalization in 1961 and 1963. Therefore, to accept Dr. Whitsel's conclusions in 1965 as determinative of the plaintiff's status on September 30, 1963, and to reject Dr. Eisenberg's conclusions, who in fact saw and treated the plaintiff in 1963, appears, on this record, arbitrary if not capricious.

Moreover, the Examiner appears to have arbitrarily accepted and rejected even parts of Dr. Whitsel's summary. His diagnosis was: "Duodenal ulcer with hemorrhage. Pulmonary emphysema with bronchospasm. Anxiety state, chronic, severe." (P. 111) Notwithstanding his diagnosis that the "anxiety state" was "severe", the Examiner asked the vocational expert to assume that such "anxiety state" was "moderate". Here he rejected Dr. Whitsel's diagnosis that the condition was "severe" and substituted his own "diagnosis" that the condition was "moderate". Similarly, he construed the diagnosis "duodenal ulcer with hemorrhage" as a "moderate" condition. We hazard the suggestion that a substantial number of medical practitioners would hardly label a hemorrhage, which may well result in death, a symptom of "moderate" proportions.

In concluding our examination and review of the entire record, we note that the hearing was held on May 15, 1969, that at the very outset plaintiff's counsel requested the opportunity to supplement the record with another medical report which he would procure within fifteen days after the conclusion of the hearing. (PP. 28 and 29) Notwithstanding, the Examiner's decision was filed on May 20, 1969, just five days following the hearing. That this deprived the plaintiff of the opportunity to submit further evidence in his behalf was noted at the time of oral argument. If the record otherwise supported the Examiner's findings, we would feel compelled to allow the plaintiff to thus supplement the record with a further medical report. However, in the light of our conclusions on the present record, we need not do so.

We have reviewed the record in its entirety, and considering the record as a whole, which we are obliged to do, we are compelled to conclude that the Examiner's findings and conclusions are not supported by substantial evidence.

As was said in Klimaszewski v. Fleming, *supra,* 176 F.Supp. at 931:

" * * * However, the definition of disability cannot be considered in vacuo. The definition relates to the individual claimant. '[T]he act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment upon that person, with whatever abilities or inabilities he has.' Dunn v. Folsom, D.C.W.D.Ark. 1568, 166 F.Supp. 44, 48."

A situation almost parallel to that involved in the instant case is found in the case of Stancavage v. Celebrezze, *supra.* There, as here, plaintiff suffered shortness of breath, coughing, with expectoration, inability to work, pains in the chest and shortness of breath when walking "about two blocks", headaches, and spent his time "lying about" the house watching television and taking short walks.

In reversing and remanding the record, the Court said as follows 323 F.2d at page 377:

" * * * There must be something more tangible establishing what employment opportunities there are for a man with his impairment. The failure of the Secretary to establish the existence of that kind of genuine employment opportunity is patent. And it must be presumed that the best available proof on this has been presented. That proof is unacceptable under Hodgson."

In the case of Bujnovsky v. Celebrezze, 343 F.2d 868, (3rd Cir. 1965), as here, plaintiff suffered from emphysema. Understandably, his complaints and symptoms were similar. Although he looked after his personal needs, he did only small chores and took short walks. He suffered from shortness of breath, coughing, weakness, pains in the chest, and fatigue. There, as here, there was medical testimony that he was totally disabled. At page 871, the Court stated: " * * * We agree with the district court that the plaintiff has adduced sufficient evidence to put the burden upon the Secretary to

show that a reasonable employment opportunity is available to him (the plaintiff)." In affirming the order of the District Court granting the plaintiff's motion for summary judgment, the Court reiterated that the words "substantial gainful activity" must be read in the light of "what is reasonably possible and not what is conceivable * * *. Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available * * *". (P. 870)

In the instant case the vocational expert candidly admitted that in some instances he was indulging in theoretical answers only.

"Q. Therefore that was merely theoretical answer that you gave?

A. That was a theoretical answer."

(P. 69)

In the case of Dillon v. Celebrezze, *supra*, the Court said as follows, 345 F.2d at page 757: "* * * Furthermore, the question of whether a claimant is disabled, as that term is used in the Act, is an inquiry which must be directed to that *particular individual*, not to a theoretical average man or even to an average claimant." In reversing the District Court and remanding the cause for the entry of summary judgment in favor of the claimant, the Court stated as follows at page 757:

"* * * We think it is a wholly unrealistic application of the statutory standards to hold that an *illiterate person of fifty-four whose only previous work experience involved the hard manual labor of coal mining and who was suffering under the cumulative psychological and physical handicap of these disabilities could be expected to obtain, much less to perform, any substantial gainful activity.* To deny this claimant the disability relief afforded by the Social Security Act in our opinion would frustrate the very purpose for which Congress enacted this legislation." (Emphasis supplied.)

Viewing the record in the instant case as a whole, we do not think that it con-

tains substantial evidence to support the Examiner's conclusions. On the entire record, we conclude that the denial of disability benefits to the plaintiff was erroneous.

Therefore, the plaintiff's motion for summary judgment will be granted and the Secretary's motion for summary judgment will be denied.