Jacob T. BOSCHE

v.

SECRETARY OF HEALTH, EDU-
CATION AND WELFARE of
the United States.

Civ. A. No. 70–1672.

United States District Court,
E. D. Pennsylvania.

April 23, 1971.

734

W. R. Mosolino, Orwigsburg, Pa., for plaintiff.

L. C. Bechtle, U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

TROUTMAN, District Judge.

This action is brought under Section 205(g) of the Social Security Act, 42 U.S. C. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. The final decision in this case is that of the Appeals Council dated April 23, 1970, denying the plaintiff's request for the review of a decision rendered by the hearing examiner on February 27, 1970, in which the examiner denied the plaintiff benefits under Section 216(i) and Section 223, respectively, of the Social Security Act, as amended.

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g). This Court has no authority to hear the case de novo. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964); Mauldin v. Celebrezze, 260 F.Supp. 287 (D.C.S.C.1966). The question here involved, therefore, is whether there is substantial evidence to support the Secretary's decision. To answer this question, it is the duty of this Court to look at the record as a whole. Boyd v. Folsom, 257 F.2d 778 (3rd Cir. 1958); Klimaszewski v. Flemming, 176 F.Supp. 927 (E.D.Pa.1959).

The test for disability consists principally of two parts: (1) a determination of the extent of the physical or mental impairment and (2) a determination whether that impairment results in an inability to engage in substantial gainful activity. Stancavage v. Celebrezze, 323 F.2d 373 (3rd Cir. 1963); Klimaszewski v. Flemming, supra, 176 F.Supp. at page 931.

"Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938). It must be enough, if the trial were to a jury, to justify a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. If there is only a slight preponderance of the evidence on one side or the other, the Secretary's finding should be affirmed. Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962).

There are four elements of proof to be considered in making a finding as to plaintiff's ability or inability to engage in any substantial gainful activity. They are: (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) plaintiff's age, educational background, and work history. Dillon v. Celebrezze, 345 F.2d 753, 755 (4th Cir. 1965); Thomas v. Celebrezze, supra, 331 F.2d at 545; Underwood v. Ribicoff, supra, 298 F.2d at 851.

Therefore, we proceed to a consideration of the entire record.

At the hearing held before the examiner on December 2, 1969, the plaintiff testified that he completed eight full grades in school. (P. 31) He was born on October 30, 1919, and is, therefore, fifty-one years of age. (P. 31) He started working at thirteen years of age on a coal truck, loading and unloading coal. (P. 32) At sixteen years of age, he commenced driving a truck. (P. 33) He continued to be employed as a truck

driver until about 1941 when he was employed by the Aetna Steel Company as a grinder and sander from which he went into the armed forces on February 17, 1942. (P. 33) Upon his discharge from the armed forces in 1945, he again resumed truck driving until 1948, when he went into the trucking business for himself and so continued until November 1954, when he sold his trucking business and continued driving trucks for another company. He so continued until September 1957, when he moved to Florida where he continued to work for a trucking company and also did laboring work for a fabricating fence company. (P. 37) While so employed in 1960, he suffered an accident, (p. 38) which caused, as he described it, a mangled toe, a broken foot which required an operation, broken ribs, a tearing of flesh from the bones in the groin on the right leg and a spinal injury involving a disc, plus abrasions, etc. (p. 39) for all of which he collected money damages in the sum of $13,000.00, approximately two years later. (PP. 39 and 40) He then moved back to Pennsylvania where he was again employed as a truck driver until May 18, 1967, since which time he has not worked. (P. 42)

He complains of severe pains in the chest, shortness of breath and a disabled left hand. (P. 42) He also complains of a stomach problem, (p. 43) is on a salt-free diet, (p. 44) is on a low-fat diet, (p. 44) and for his pains in the chest takes medicine which results in severe headaches (p. 45). In his bedroom he has an oxygen tank which he many times uses in order to sleep. He takes medicine for his intestinal and stomach problems, medicine for his chest problems, medicine for his nerves, and medicine for his blood pressure. (P. 46) Significantly, the pains in his chest sometimes radiate into his left arm. (P. 49) For his chest pains, he was originally given nitroglycerin which was ineffective and, accordingly, another drug was prescribed which, as he previously testified, causes severe headaches. (P. 50)

By reason of an accident suffered in the armed forces, involving an injury to his left wrist and hand, he received service-connected disability compensation in the amount of $89.00 per month and by reason of his heart condition, he receives non-service connected disability compensation in the additional sum of $30.00 per month, for a total of $119.00 per month. (PP. 11 and 51)

At the conclusion of the plaintiff's testimony, the examiner, on the record, recognized the difficulties involved in this case in the following language:

"HEARING EXAMINER: I might tell you that this is a very difficult case to come to a difficult conclusion on the evidence is very conflicting. It may very well be that this man has a coronary condition. Most of the evidence points against it but Dr. Dreifus I want you to know is perhaps one of the outstanding cardiologists in Philadelphia. He is attached to several hospitals. I understand he is a Professor of Cardiology." (PP. 48 and 49)

Thus, the examiner indicated his intention to rely heavily upon the recommendations of Dr. Dreifus who has never seen or examined the plaintiff in this case and to whose report we shall refer in due course.

Considering the plaintiff's condition in its totality, we are concerned with an accident in the Service, for which he is receiving a service-connected disability compensation, an accident while in Florida of considerable severity, for which he received $13,000.00 in compensation, a possible heart condition, a possible chest condition, and related conditions which plaintiff contends are totally disabling. The Veterans Administration has determined that the condition of the left wrist alone is "thirty per cent disabling". (See page 82) The Veterans Administration has determined that this constitutes a "vocational handicap". (See page 82) Such were the findings as of July 13, 1945. However, as of June 21, 1968, the Veterans Administration found that his service-connected

disability had increased from ten per cent to forty per cent and thus awarded him compensation not only for the condition of the left wrist, but also for "hypertensive heart disease". (P. 98) On July 1, 1968, he was found by the Veterans Administration to be "totally disabled for insurance purposes" and entitled to a waiver of insurance premiums.

Therefore, plaintiff's condition must be considered against a background of an accident in 1940, in which he fractured his left wrist and lost several months' work; an accident while in the military service in 1942, in which the left wrist was again fractured and rebroken; the development of lobar pneumonia in December 1955, which disabled him for several months; the development of a resulting lung condition by reason of which he went to Florida in 1957, where he was involved in a serious automobile accident resulting in a broken left ankle, broken ribs, lacerations, contusions and abrasions, nerve damage and spinal injury, as a result of which atrophy of the left arm and left leg now exists. (P. 88) Narrowing of the blood vessels is now alleged, with pains in the heart and chest, difficulty in breathing and shortness of breath. (P. 89)

As early as January 1956, X-ray studies at the A. C. Milliken Hospital, Pottsville, Pennsylvania, disclosed a lung condition described by Dr. William Dzurek as follows:

"The examination shows an irregular mottling in the both bases which partly obliterates the normal lung markings, more marked on the left side. Marked accentuation of the hilar densities is noted bilaterally and moderate lung fibrosis was found in the mesial portions of the lung fields. The trachea is not displaced and the apical portions are well aerated. * * *

"Tent. X-ray Diag: Parenchymatous involvement of both bases of unknown etiology. The findings in the left base are suggestive of pneumonitis in the state of resolution. The right side is more suggestive of a pulmonary congestion on a cardiac bases. A repeat examination is requested in about five days."

(P. 109)

A check-up one week later disclosed that the lung condition was improving, but unfortunately revealed a "cardiac" condition causing pulmonary congestion, suggesting "impending cardiac failure".

"The checkup shows an almost complete clearing of the previously reported involvement in the bases which confirms the diagnosis of the involvement being of cardiac origin indicating pulmonary congestion due to impending cardiac failure. * * * "

(P. 110)

Thus, as early as 1956, we see the beginning of a condition which the plaintiff, twelve years later, contends is, along with other conditions, totally disabling. Heart studies in June 1967 disclosed a tracing which "does not appear to be completely normal". (P. 119) In October 1967, he was examined by Dr. Norman M. Wall, a distinguished internist and cardiologist, who found the plaintiff suffering from "definite evidence of hypertension with early hypertensive heart disease" and "coronary insufficiency". (P. 125) Blood pressure was elevated and medication prescribed, together with a low-salt diet. An electrocardiogram disclosed "evidence of left ventricular preponderance". Dr. Wall described the plaintiff as a "candidate for a serious heart condition". (P. 125) He again saw the plaintiff on several occasions in 1967 and found the plaintiff suffering from anginal pains, dyspnea and fluctuating blood pressure. (P. 124) He also found evidence of a definite pulmonary fibrosis of the lungs, together with an "enlargement of the heart". (P. 124) He concluded:

" * * * this man does have serious hypertension, and serious hypertensive heart disease with angina and he is a candidate for a serious heart attack if he does any type of exertive work."
(P. 124)

Dr. Wall continued to see the plaintiff professionally and by August 1968, determined that still another condition had been added, namely, "a productive cough which contained some blood" together with wheezing. (P. 149) Pulmonary fibrosis, of course, continued to exist, (p. 149) and although the heart condition was responding to medication, the plaintiff continued to have definite evidence of coronary insufficiency and Dr. Wall predicted that the plaintiff would be unable to do any type of exertion without precipitating "more angina". He concluded:

> "Although his pressure now is returning to normal on therapy and his electrocardiogram is within normal limits, he does have definite evidence of coronary insufficiency clinically and he would do poorly if he was off therapy.

> "Diagnosis: HYPERTENSION, HYPERTENSIVE HEART DISEASE WITH CORONARY INSUFFICIENCY.

> "This man is not able to do any type of exertive work without precipitating more angina". (P. 148)

Dr. W. H. Schlitzer, likewise an attending and examining physician, found the plaintiff suffering from pains in the chest upon exertion as early as May 1967. The plaintiff missed several weeks from work and then returned only to have the chest pains recur which, according to Dr. Schlitzer, forced the plaintiff to "stop his work". (P. 127) He too found a left ventricular preponderance and made a diagnosis of hypertension with hypertensive heart disease and coronary insufficiency. (P. 130) In October 1968, Dr. Schlitzer found a fluctuating blood pressure and noted that the plaintiff suffered severe pain substernally and extending into his arms when he engaged in heavy lifting. He also noted a slight productive cough containing some blood. (P. 150) He found wheezing in both lungs, (p. 151) and again made a diagnosis of hypertension with hypertensive heart disease

which he noted was totally and permanently disabling. (P. 153)

At the Government's expense the plaintiff was examined on one occasion by Dr. Amilcar E. Longarini who found him suffering from some narrowing of the arteries, (p. 155) a "considerable degree of air trapping and bronchospasm", (p. 156) and evidence of "hyperventilation in both lung fields". (P. 156) Based on one examination only, he agreed that the plaintiff is disabled, but disagreed that disability is the result of a heart condition and concluded, on the contrary, that the *"main cause of disability .in this patient is pulmonary emphysema with a considerable degree of bronchospasm"*. (P. 157) He suggests that the condition "should" be amenable to therapy, but absent actual treatment which he could not afford on one visit, was, of course, unable to state that the condition was in fact amenable to therapy. In its entirety, Dr. Longarini's report does not suggest that plaintiff's claim of disability is without merit. While Drs. Wall and Keeter contend that plaintiff is totally disabled from all causes, Dr. Longarini has apparently concluded that the plaintiff's disability, although nonetheless total, is the result of only one cause. The legal result is the same.

An admission to the Pottsville Hospital and Warne Clinic on September 4, 1969, and resulting in X-ray studies of the plaintiff's spine indicated him suffering from "degenerative changes". (P. 182) It will be recalled that this condition is superimposed upon accidental injury suffered in Florida in previous years. X-ray studies in September 1969 also disclosed that the plaintiff suffers from a non-functioning gallbladder. (P. 183) The diagnosis on discharge, according to the hospital record, was "coronary insufficiency with angina pectoris, severe. Myocardial infarction, acute, based on enzyme studies, hypertension, non-functioning gallbladder, fracture, left wrist, old, with limitation in motion". (P. 180) These findings followed a complete and extended hospitalization of the plaintiff from September 4 to September 27, 1969.

These findings, based upon such extended and complete studies, are substantial and valid above and beyond limited and less complete studies made on one examination on one occasion and in one day. Dr. Keeter also found myocardial ischemia. (P. 186) Dr. Keeter's treatment extended from September 4, 1969 to October 29, 1969, (p. 189). His report indicated a history that on September 4, 1969, the plaintiff suffered an "attack" consisting of diffuse substernal pains radiating into both walls of the chest. This attack occurred while watching television. Nitroglycerin tablets gave him no relief. He developed dyspnea and sweating and was admitted to the hospital. Hypertension since May of 1967 with treatment therefor was noted, (p. 189) and it was noted that the heart sounds were of poor quality and distant. (P. 190) The condition of the left wrist, heretofore detailed, was likewise noted. It is understandable that total disability would naturally flow from the combination of the several conditions from which Dr. Keeter found the plaintiff suffering as a result of detailed and extended studies made and conducted during the period of the plaintiff's hospitalization from September 4, to September 27, and continued treatment to October 29, 1969.

> "Coronary insufficiency with angina pectoris, severe
> Myocardial infarction, acute
> Arterial hypertension.
> Non-functioning gallbladder.
> Fracture, left wrist, old, with limited motion."
>
> (P. 192)

At the Government's expense the plaintiff was likewise examined by Dr. Albert J. Kazlauskas, a psychiatrist, who, understandably, found the plaintiff suffering from a "mild anxiety" resulting from the fact that "this man has been told he cannot work by his attending physician because of his organic condition relating to his coronary status and his hypertension". (P. 146) That the plaintiff suffers no psychiatric condition except an understandable and expected "mild anxiety" is to his credit and indicates that his failure to work is not intentional on his part, is not motivated by the attitude of a malingerer, but, on the contrary, results in fact from his physical condition. In any event, the findings and conclusions of Dr. Kazlauskas are not at variance with plaintiff's contention that he is totally disabled.

At the Government's expense the plaintiff was examined by Dr. Clyde H. Kelchner on one occasion only, who, under date of March 8, 1968, submitted a report in which he stated that he had examined the plaintiff and among his diagnoses included the following: Generalized arteriosclerotic cardiovascular disease; hypertension; coronary insufficiency; cardiac anxiety neurosis; degenerative disease of the bone and joints of the left shoulder; fibrositis and bursitis of both shoulders, hips and back; old fracture, left carpal os naviculare, non-union; osteoporosis of the left wrist; post-accident atrophy of the left calf muscles, possible nerve injury. (P. 134) He concluded that plaintiff is unable to continue driving a truck, lift over ten pounds, rush, climb hills or steps, walk against the wind, use left wrist very much or do work requiring more than eighth-grade intelligence. (P. 134) If we have properly analyzed Dr. Kelchner's "diagnoses" and paragraphs which follow it, (p. 134) then it appears that the concluding paragraph of his report is inconsistent with his findings. Significantly, it is only the concluding paragraph of his report from which the examiner quotes. (P. 13) That concluding paragraph suggests in language which smacks of sarcasm that the "medical prognosis is fine for life"; that the prognosis is fine "for return to gainful occupation as he (plaintiff) has always capitalized on his left wrist in the Army; his accident;" (p. 134). It is inconsistent, contradictory and unbelievable to make a diagnosis of arteriosclerotic cardiovascular disease, hypertension, coronary insufficiency, cardiac anxiety neurosis, degenerative disease of the bones and joints, osteoporosis and

atrophy of the muscles, and to then conclude that plaintiff has "capitalized" on his unfortunate accidents and his physical condition. With equal or greater inconsistency, Dr. Kelchner, after suggesting that plaintiff should return to work, then suggests that he needs "tranquilizing, such as afforded by Librium", nitroglycerin, analgesics and physiotherapy. (P. 134)

To suggest that a course of tranquilizers, analgesics and physiotherapy may improve or better the plaintiff's condition is one thing. To conclude that because such course of treatment may improve his condition is to establish that he is not totally disabled and that his "prognosis is fine for life" is incredible. Significantly, the examiner did not allude, in any way, to the inconsistencies and contradictions contained in Dr. Kelchner's report. On the contrary, he quoted only from the concluding paragraph thereof which operated to the detriment of the plaintiff, being careful not to quote from the diagnoses or other portions of the report which tend to favor the plaintiff.

As a matter of fact, the examiner, after briefly referring to each medical report in the record, proceeded by way of "discussion" to refer only to the report of Dr. Dreifus. (P. 18) Dr. Dreifus never saw and never examined the plaintiff. He reviewed only the records submitted to him by the examiner. On the basis thereof he was unable to agree that plaintiff suffers hypertensive heart disease, coronary insufficiency, or arteriosclerotic heart disease. (P. 197) He agreed as to "pulmonary limitations", suggesting that the plaintiff is limited in that he cannot climb more than a flight of stairs at a time or, for example, lift more than fifty to sixty pounds over a sustained period. (P. 198) He precluded the plaintiff from working in "dusty or moist" conditions. (P. 199) In conclusion, he conditioned his opinion as regards the non-existence of coronary artery disease upon the performance of a "selective cine coronary arteriography". He stated that the performance of such a test would be necessary for a "final definition" or diagnosis as to the existence of the coronary condition alleged. He concluded, "I think it will be doing this man a disservice if this study were not performed" *It was not performed.* It was not performed because of "undesirable side effects". (P. 200) The importance of such test in the formulation of his conclusions, was repeated by Dr. Dreifus in his letter of December 17, 1969, addressed to the examiner. In the same communication, he emphasized that he was also without certain electrocardiographs important to his conclusions.

"Unfortunately, I do not have the electrocardiograms taken from the May 23rd, 1967 to his discharge from the A. C. Milliken Hospital at the time of his alleged heart attack. Perhaps this could help me in some way * * *.

"I cannot, of course, insist upon coronary cine angiography in view of the opinions offered by the State Board of Vocational Rehabilitation Exhibit 39. * * * "

Thus, Dr. Dreifus recognizes that absent the electrocardiograms in question and absent a "coronary cine angiography" (p. 201) his conclusions lack the validity which might otherwise attach to them.

Moreover, at the hearing held on December 2, 1969, the examiner frankly stated that he considered the statement and report of Dr. Dreifus *"inadequate"* absent the test in question. He, therefore, secured from the plaintiff the opportunity to send the "matter back" for the test in question, intending to submit the results thereof to Dr. Dreifus.

" * * * Now, I also call to your attention Dr. Dreifus' statement to the Bureau of Vocational Rehabilitation. He says some things in his report and I think it is *inadequate.* Dr. Dreifus says I would stress the requirement of selective angiography before this man is labeled a cardiac cripple for the rest of his life. Do you have any objection to me sending this matter back to the State Agency for such a cine angiography?" (P. 48) (Emphasis ours.)

As it developed, the State Agency refused the test because of "undesirable side effects", (p. 200) and absent same Dr. Dreifus could do nothing more than reiterate his original position (p. 201) which, as early as December 2, had been labeled by the examiner as "inadequate". Notwithstanding the examiner's comments and conclusions at the time of the hearing, he nonetheless relied exclusively upon the conclusions of Dr. Dreifus as to the existence of the pulmonary and coronary conditions in question. The examiner stated:

> "With regard to the asthma and heart conditions, the Hearing Examiner *must be guided* by the evaluation as as set forth by Dr. Dreifus. * * * (Emphasis ours.) (P. 18)

There is nothing in the record or in the law to suggest that the examiner "must be guided" by a medical opinion submitted by one, no matter how well qualified, who has never seen or examined the plaintiff, who expresses a desire for the performance of certain tests in order to arrive at a conclusion, which tests were not performed, and whose report and conclusions have already been labeled "inadequate", absent the performance of such tests and the submission of certain electrocardiograms.

We have no hesitancy in concluding that the examiner erred in suggesting that he "must be guided" by the evaluation of Dr. Dreifus who had neither seen nor examined the plaintiff, who requested the performance of certain additional tests to confirm his evaluation, which tests were not performed, who requested the submission of certain electrocardiograms which were not supplied, and whose evaluation, absent such tests, was originally labeled by the examiner as "inadequate".

Viewing the record as a whole, it is apparent that the conclusions of the examiner, as adopted or affirmed by the Appeals Council, must necessarily be based exclusively upon report of Dr. Kelchner and/or the report of Dr. Dreifus. We have commented as to both.

To the contrary, and supporting the plaintiff's contentions, are the statements and reports of the attending and treating physicians, Dr. Wall, Dr. Schlitzer, Dr. Keeter and the related and supporting hospital records and other evidence. Their opinions and conclusions clearly demonstrate that the plaintiff is not able to perform substantial, gainful employment or activity. The reports and the conclusions of Dr. Kazlauskas and Dr. Longarini do not prove anything to the contrary. Therefore, considering the *record as a whole,* as we are obliged to do, we are compelled to conclude that the examiner's conclusions as adopted and affirmed by the Appeals Council are not supported by substantial evidence.

As was said in Klimaszewski v. Flemming, *supra,* 176 F.Supp. at 931:

> " * * * However, the definition of disability cannot be considered in vacuo. The definition relates to the individual claimant. 'The act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment upon that person, with whatever abilities or inabilities he has'. Dunn v. Folsom, D.C.W.D.Ark. 1958, 166 F.Supp. 44, 48."

This case is not unlike the case of Stancavage v. Celebrezze, *supra,* where, in reversing and remanding the record, the Court said as follows at page 378 of 323 F.2d:

> " * * * There must be something (more) tangible establishing what employment opportunities there are for a man with his impairment. The failure of the Secretary to establish the existence of that kind of genuine employment opportunity is patent. And it must be presumed that the best available proof on this has been presented. That proof is unacceptable under Hodgson."

In the case of Bujnovsky v. Celebrezze, 343 F.2d 868, (3rd Cir. 1965), as here, plaintiff suffered from emphysema. Understandably, his complaints and symp-

toms were similar. Although he looked after his personal needs, he did only small chores and took short walks. He suffered from shortness of breath, coughing, weakness, pains in the chest, and fatigue. There, as here, there was medical testimony that he was totally disabled. At page 871, the Court stated: " * * * We agree with the district court that the plaintiff has adduced sufficient evidence to put the burden upon the Secretary to show that a reasonable employment opportunity is available to him (the plaintiff)." In affirming the order of the District Court granting the plaintiff's motion for summary judgment, the Court reiterated that the words "substantial gainful activity" must be read in the light of "what is reasonably possible and not what is conceivable * * *. Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available * * *". (See p. 870)

The testimony and conclusions of the vocational expert, H. Dale Freidman, are improperly based upon assumptions not supported by the record. For example, he assumes that the pulmonary condition is only "mildly" disabling. (P. 54) He assumes that the plaintiff is only "minimally medically involved". (P. 55) He frankly admitted in his own language, "I'm giving this all on an assumption". He conceded that if he were to assume other facts his conclusions would be otherwise. (P. 26) He admitted that if the pulmonary condition and/or the coronary condition were "severe" the plaintiff would then be unemployable. (P. 60) Thus, the testimony of the vocational expert, based, as it is, upon assumed facts not supported by the record, does not establish the availability of employment for which the plaintiff is qualified and which he can perform.

· As was said in Dillon v. Celebrezze, *supra,* " * * * Furthermore, the question of whether a claimant is disabled, as that term is used in the Act, is an inquiry which must be directed to that *particular individual,* not to a theoretical average man or even to an average claimant." See 345 F.2d page 757 of the opinion.

Viewing the record as a whole, we conclude that it does not contain substantial evidence to support the examiner's conclusions as affirmed or adopted by the Appeals Council. On the entire record, we conclude that the denial of disability benefits to the plaintiff was erroneous.

Therefore, the plaintiff's motion for summary judgment will be granted and the Secretary's motion for summary judgment will be denied.

At the time of oral argument, the plaintiff requested a remand of the record in the event his motion for summary judgment is denied. The additional evidence which he desires to produce relates to his hospitalization from February 5 to 26, 1971. Were we to deny his motion for summary judgment he would be entitled to an opportunity to produce such additional testimony. Carnevale v. Gardner, 393 F.2d 889 (2nd Cir. 1968); Mann v. Gardner, 380 F.2d 182 (5 Cir., 1967). However, in view of the fact that plaintiff's motion for summary judgment will be granted, his motion to remand the record will be denied.