**Edna K. (Moore) ELLIS**

v.

**Robert H. FINCH, as Secretary of Health, Education and Welfare.**

**Civ. A. No. 69–1682.**

United States District Court, E. D. Pennsylvania.

Oct. 20, 1971.

Joseph A. Zane, Schuylkill Haven, Pa., for plaintiff.

L. C. Bechtle, U. S. Atty., Philadelphia, Pa., for defendant.

## OPINION

TROUTMAN, District Judge.

This action is brought under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health, Education and Welfare. The final decision in this case is that of the Appeals Council dated May 26, 1969, denying the plaintiff's request for the review of a decision rendered by the hearing examiner on April 24, 1969, in which the examiner denied the plaintiff benefits under Section 216(i) and Section 223, respectively, of the Social Security Act, as amended.

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g). This Court has no authority to hear the case *de novo*. Thomas v. Celebrezze, 331 F.2d 541 (4th Cir. 1964); Mauldin v. Celebrezze, 260 F. Supp. 287 (D.C.S.C.1966). The question here involved, therefore, is whether there is substantial evidence to support the Secretary's decision. To answer this question, it is the duty of this Court to look at the record as a whole. Boyd v. Folsom, 257 F.2d 778 (3rd Cir. 1958); Klimaszewski v. Flemming, 176 F.Supp. 927 (E.D.Pa.1959).

The test for disability consists principally of two parts: (1) a determination of the extent of the physical or mental impairment and (2) a determination whether that impairment results in an inability to engage in substantial gainful activity. Stancavage v. Celebrezze, 323 F.2d 373 (3rd Cir. 1963); Klimaszekski v. Flemming, *supra*, 176 F. Supp. at page 931.

■ "Substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". Consolo v. Federal Maritime Commission, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966); Consolidated Edison Co. of N. Y. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It must be enough, if the trial were to a jury, to justify a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. If there is only a slight preponderance of the evidence on one side or the other, the Secretary's finding should be affirmed. Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962).

■ There are four elements of proof to be considered in making a finding as to plaintiff's ability or inability to engage in any substantial gainful activity. They are: (1) medical data and findings, (2) expert medical opinions, (3) subjective complaints, and (4) plaintiff's age, educational background, and work history. Dillon v. Celebrezze, 345 F.2d 753, 755 (4th Cir. 1965); Thomas v. Celebrezze, *supra*, 331 F.2d at 545; Underwood v. Ribicoff, *supra*, 298 F.2d at 851.

Therefore, we proceed to a consideration of the entire record.

■ At the hearing held before the examiner on March 4, 1969, the plaintiff testified that she was then forty-two years of age, that she had completed a high school education, and that she was the mother of three children, aged sixteen, eighteen and twenty-one years respectively. (P. 43) Her education consisted of the usual high school courses and to the extent that she received any training in typing, shorthand or bookkeeping, she had not followed through with further training in such field and had no experience therein whatever. (P. 44) On the contrary, the only work which she has performed is that of a machine operator, first in a fibreglass factory spinning yarn and, later as a sewing-machine operator. (P. 44) She last worked on September 29, 1967, having commenced work originally in 1946, but having interrupted her career as a worker because of her intervening career as a mother. (P. 45) She testified that because of her poor state of health, including coughing and shortness of breath, she was unable to attend work regularly and was, therefore, fired apparently in 1967, but was later rehired because of the intervention of the Union. (P. 46) She has been under the care of the family physician, Dr. Schooley, since 1964 and, among other things, is allergic to dust, sewing materials, the lint from such materials, dyes, glues, smoke, etc. (P. 46) Her condition in this respect continued from 1964 through 1967 and became, she stated, "progressively worse". (P. 46) Accordingly, she eventually left her work in September of 1967. (P. 47) Efforts to control her condition resulted in her hospitalization in the F. W. Black Hospital at Lewistown where she was first admitted for a period of five days, went home one day, was returned immediately for six more days, was home three days, and then sent to the Holy Spirit Hospital at Camp Hill for treatment by a specialist. She was at the Holy Spirit Hospital at Camp Hill for a period of eleven days, being treated for her lung condition including asthma and bronchitis. She testified that as she was subjected to the dust located in the area at which she worked, she would become short of breath and commence coughing. (P. 48) This became the subject of comment and objection by her fellow-workers. (P. 48) She also complained of arthritis and fibrosis. (P. 48) She explained that the joints in her fingers "swell considerably", that her feet and legs likewise swell and that at times she cannot bend her ankles or fingers. (P. 48) On occasions, therefore, she cannot stand. (P. 49) She is unable to remove the rings upon her fingers because of swelling and, particularly in the morning, is unable to do anything with her hands, sometimes having difficulty even carrying a cup.

She testified that sometimes her "ankles don't move at all". (P. 49)

Her past state of health has been the subject of several operations and other surgery, including a tonsilectomy, appendectomy, hysterectomy, the removal of a cyst from her bladder and the removal of "growths" from the joints of both wrists. (P. 50) The combination of these medical experiences in the past has created what she described as a "nervous" condition which, in turn, affects her asthmatic condition, causing coughing and headaches. (PP. 50, 51) Receipts were presented establishing the purchase of substantial drugs during 1967 and 1968, the consumption of which, however, has not relieved the conditions of which the plaintiff complains. (PP. 51, 52)

Since she last worked on September 29, 1967, she has attempted to perform certain duties in the home, but is unable to perform substantial duties because of her chronic cough resulting from her asthmatic condition which keeps her awake at night, requires that she sleep on propped-up pillows and causes repeated coughing spells. (P. 53) She also suffers an arthritic condition of her hands which she states prevents her from performing "fancy stitching" which she previously did in connection with her work and which she is no longer able to do because she cannot so much as write a letter without suffering pains in her hands, cannot twist her hand or wrist, is unable to pick up small objects and perform like functions. (PP. 53, 54)

Since September 1967 the employment office, as recently as 1969 when the hearing was held before the examiner, sought to obtain employment for the plaintiff in the area in which she resides, but was unable to obtain any work for her. (P. 54) She indicated her willingness to return to work if she could do so, but in this connection pointed out that she is not able to drive an automobile any distance because of coughing spells resulting from her asthmatic condition which at times cause her to "black out" and therefore make of her a very dangerous driver. (P. 55) Additionally, she has arthritis of the hands and fingers making it difficult for her to grasp the wheel. (P. 55) Only one train and no buses whatever service the area in which she lives each day.

In addition to all of the above, she suffers an allergic condition and is, among other things, allergic to cosmetics whether worn by her or by others and detailed a personal experience when, while attending her son's graduation, she was carried out because of the "perfume and stuff" worn by other people which was just "too much for me".

"Q. Do you think you would be able to do any work as a clerk?

A. I cannot be out with the public.

Q. Why not?

A. Because I'm allergic to the cosmetics, a lot of materials that other people wear, even cosmetics on other people. I went to my son's graduation, they almost had to carry me out because of the perfume and the stuff the other people had on was too much for me.

\* \* \* \* \* \*

Q. But your husband smokes, right? You've indicated that you are even allergic to cosmetics and perfume worn by men and women, because there is a great trend toward men wearing colognes, after shave lotions.

A. I know.

Q. They adversely affect you, right?

A. Yes, sir.

Q. To the extent that you are unable to be among people?

A. That's right."

(See pages 56 and 57.)

The efforts by the employment office to obtain employment for her antedated the point in time at which the arthritic condition of her hands became so bad that in her language "I could not use my hands". (P. 58) The employment office, she states, was aware primarily of her

asthmatic condition and was not aware of her more recently developed arthritic condition which has been diagnosed by Dr. Whitehill. (P. 59)

Dr. Whitehill recognizes the arthritic condition of the hands and fingers as being something which prevents her from doing "any typing or anything that may cause her discomfort with her hands". He so stated in report dated as recently as January 7, 1969. (P. 235) In connection with certain operations performed on both wrists and at least one finger, he advised the plaintiff, referring to the arthritic condition, that "he could do nothing about it." (P. 59)

She admits that the arthritic condition is not as serious as that suffered by her mother and that she, the plaintiff, is not, like her mother, so "crippled up" that she "cannot move". However, her fingers and her ankles are, in her language, "crippled up", but she admits that she is not yet "a complete cripple with arthritis". (P. 60) Since being considered for employment by the employment office, which was unable to place her, the arthritic condition has substantially worsened.

> "Q. But since that time the swelling, the pain in the fingers and in the joints of your fingers has substantially worsened?
>
> A. Yes."

(See page 61)

Her I. Q. is such that she is college material and considered "above average", but against the possibility of her going to college is the fact that her allergic condition is such that she cannot be exposed to and come in contact with people. (P. 63) Moreover, it is unrealistic to expect a mother with three children in her circumstances to assume a four-year college course which, as subsequently indicated by the vocational expert, might well become a six-year course. In any event, continuing with the arthritic condition, she explained that she cannot, when reading, hold the book for an extended period of time but is obliged to lay it in her lap. (P. 64)

Thus, she finds herself in a position where she cannot assume employment which exposes her to the public because of her allergic condition and, on the other hand, she cannot remain at home alone because of her coughing spells resulting from her asthmatic condition which she suggests could choke her "to death". (P. 65).

Then follows an extended and somewhat irrelevant cross-examination of the plaintiff by the examiner indicating that it was the latter's impression that the plaintiff's marriage, as recently as August 30, 1968, indicates that she is not as substantially disabled as her testimony would suggest. Obviously, the plaintiff's marriage proves nothing with respect to the extent of her disability. Moreover, the resulting colloquy in which sarcasms were exchanged as between the examiner and the plaintiff's counsel adds nothing to the record except to place the plaintiff's counsel on a platform from which he argues that the examiner was personally biased and prejudiced as against this particular plaintiff.

Plaintiff's husband, Raymond Ellis, testified that he has known the plaintiff since 1966, that he knew of her physical condition during the entire period of their acquaintance and that it has become progressively worse. (P. 74) He explained that he has seen her completely black out as the result of coughing resulting from her asthma, that he has seen her gasp for air and, on occasions, "turn blue". (P. 75) He states that she constantly loses sleep with coughing spells, that she sleeps on pillows and is, under any circumstances, unable to sleep a whole night. (PP. 75, 76) She is unable to negotiate steps, performs very little of her housework and cooking, most of which is performed by her daughter. (P. 76) She complains constantly of pain in her hands and ankles, suffers from a swelling of her joints, particularly in the morning, is unable to move her ankles for some period of time in the morning, and "not able to do anything with her hands".

"A. No, she definitely is not able to do anything with the hands. You've seen a monster move— her hands are just crippled that bad."

(See page 77.)

Additionally, she is extremely nervous which "triggers her asthma" and requires repeated trips to the doctor. (P. 78) On an average she sees the doctor about twice a week. (P. 78) Her physical condition, according to the testimony of her husband, results in "emergency" situations, requiring him sometimes to return home over the lunch hour. (P. 81) Since their marriage in August 1968, plaintiff's coughing has become more frequent, more severe, and for longer periods of time. (P. 82)

Her daughter, Georgia Moore, who was cross-examined at length by the examiner, testified as follows:

"Q. Georgia, how long have you been doing the work around the house?

A. Since 1965.

Q. Why has that been?

A. My mother had her hysterectomy in 1965.

Q. How has her condition become since that time?

A. It's been gradually growing worse.

Q. In what respect?

A. The asthma attacks in the summer would come more often than in the winter because she's out more, she's just slowly getting nervous, her nerves are the worst thing.

Q. How about her hands?

A. When this first started, they weren't real bad but now when she gets up in the morning they're real stiff, and she cannot carry hardly anything. The only way she keeps them from getting stiff completely she plays the organ a little bit in the afternoon.

Q. A little chord organ?

A. It's a little chord organ.

Q. Trying to keep her hands from getting too stiff?

A. Yes.

Q. Do you hear your mother coughing at any time?

A. Yes, I do, she coughs quite a bit."

(See page 85.)

It is the daughter who does most of the cooking. (P. 86) Because of her mother's condition, she wears no cosmetics although her classmates use a great deal of "make-up and powder". (PP. 86, 97) She explained that her mother is unable to any longer remove the rings from her fingers. (P. 87) She further testified that although her mother does not complain of her condition, she sometimes passes out as the result of it.

"Q. Did you always notice your mother was in pain when wou were at home? Did she complain of pain?

A. She never complains to me but you know she is in pain.

Q. You observed?

A. Yes, you can.

Q. Did you ever see your mother pass out from these spells that she has?

A. Yes, I did.

Q. How do they affect her?

A. She just starts coughing and she gets so—the lack of oxygen, air and stuff, and she just passes out."

(See pages 87 and 88.)

Again, differences developed between plaintiff's counsel and the examiner and this sixteen-year old witness was subjected to a grilling cross-examination in which the examiner labeled as "incredible" her testimony that she arrives home from school and prepares dinner, commencing about 4:30 P.M. and concludes about 6 P.M. (P. 92) This is not "incredible" and does not deprive the testimony of this witness of the credi-

bility which it deserves, assuming that the meals are properly planned, dishes inserted in the oven by the plaintiff and the dishes cleaned by the plaintiff and the witness as testified by the plaintiff. (P. 93) The household cleaning work is performed by the daughter during certain evenings of the week and, more particularly, on Saturday. (P. 94)

Obviously, the testimony just reviewed does not support the examiner's findings and conclusions. A further review of the record indicates that as early as October 2, 1967, the plaintiff was officially interviewed and it was noted that she was then suffering from bronchial asthma. (P. 171) In describing her "physical condition", it was stated that she "had slightly florid complexion. She coughed rather frequently throughout the interview and coughing was from deep in chest". (P. 174) The interviewer was left with the impression that she was "depressed". (P. 174) Allergy tests made as early as May 16, 1966, and while she was still working, disclosed a long list of items to which she is admittedly allergic. (P. 179) Medical reports submitted by Dr. Schooley in 1968 indicated that he had been seeing the plaintiff professionally since September 1967 and found her suffering from shortness of breath, tightness in the throat, coughing and wheezing. He made reference to numerous allergies as to which attempts were made to desensitize the plaintiff, but without results. He suggested that she would become asymptometic only when completely removed from "deleterious environments". (P. 181) It was noted that she was suffering from "subcrepitant wheezing rales ausculated over entire chest". (P. 182) Hospital records completed as early as December 26, 1966, (p. 185) indicate that plaintiff was then suffering from pains and stiffness throughout the vertebral column, weakness and aching in the legs, which condition had become "progressively more severe" and was "unrelieved" by medication taken at home. (P. 185) A diagnosis was made as follows: "Myofascitis, and Myofibrositis—bronchial asthma, coccydynia, migraine cephalgia". (P. 185) It was noted that plaintiff was suffering from a chronic cough, occasional dyspnea, night sweats, chills and fever. (P. 185) Although she was discharged as "doing well", she continued, even at time of discharge, to complain of muscle aching and it was determined that there was a less than normal intervertebral disc space between L5 and S1. As to the chest, it was further determined that she was suffering a "chronic peri-bronchial thickening representative of possible upper respiratory infection". (P. 187)

Further reports submitted by Dr. Schooley, under date of July 27, 1968, refer to the plaintiff's adverse reactions to allergy shots resulting in migraine headaches. (P. 195) As a result discontinuation of the allergy shots was advised. Antihistamines were substituted, together with bronchial dilators, notwithstanding which the plaintiff's "allergic symptoms kept recurring". (P. 195) Plaintiff, according to Dr. Schooley's report and as indicated in other portions of the record, was rehospitalized in the F. W. Black Hospital for recurring acute bronchitis and bronchial asthma. Following two successive admissions and apparent inability to control her condition, she was hospitalized in the Holy Spirit Hospital at Camp Hill where it was advised that she should work only in an environment which was allergen-free. (P. 195) As a result of the several hospitalizations in question and his continued treatment of the plaintiff, Dr. Schooley made a diagnosis of "allergic, asthmatic tracheobronchitis", "migraine cephalgias", "depressive neurosis". (P. 198) Dr. Schooley's subsequent report of October 21, 1968, indicates no improvement in the plaintiff's condition. (Pp. 199–202 inclusive) Successive reports filed and submitted by Dr. Schooley indicate a progressively worse condition suffered by the plaintiff over the period transpiring subsequent to her last day of work. Dr. Schooley's reports, his opinion and the supporting hospital records

do not support the examiner's findings and conclusions.

On March 18, 1968, the plaintiff was examined, at the request of the Pennsylvania Bureau of Vocational Rehabilitation, by Dr. Albert DeMatteis, a specialist in thoracic surgery (pp. 191 to 194, inclusive) whose examination was apparently confined to the plaintiff's chest condition. He made no orthopedic examination and no mention was made of the condition of plaintiff's hands, fingers, wrists and ankles. In short, no reference whatever was made to the arthritic condition and the examination and the results thereof were apparently confined to the chest conditions from which the plaintiff complained and suffers. He found "an increase in the bronchovascular markings," (p. 192) and concluded that the plaintiff suffers from chronic asthmatic bronchitis with episodes of dyspnea. He concluded that she suffers from coughing and wheezing which are frequent and particularly worse at night and in any event occurring daily. He concluded that, in addition, that she has developing pulmonary emphysema, that she is sensitive to *any dust and other irritants* which aggravate her asthmatic state. Although he concluded that she was not totally disabled, he expressly stated "she will have to be cautious of the type of work she does in order to minimize the effects of her asthma". (P. 193)

Thus, it is evident that Dr. DeMatteis in March of 1968 found a new and additional condition developing in connection with the plaintiff's overall physical condition, namely, pulmonary emphysema. While he did not find the plaintiff totally disabled as the result of her chest conditions and allergies, standing alone, he did find certain limitations imposed by reason thereof, advising that she be "cautious of the type of work she does". Standing alone, the opinion of Dr. DeMatteis does not support the examiner's findings and conclusions because it relates only to the chest conditions from which the plaintiff suffers and does not relate to the combined effects of her overall physical condition as a whole.

Similarly, Dr. William J. Boyd, who made a final diagnosis of "acute asthmatic tracheobronchitis" did not appraise plaintiff's condition in its totality, but did find the condition diagnosed, making reference, at the same time, to swelling of the hands, feet and abdomen, together with "extreme fatigue". He also made specific reference to an increase in her "cough". He makes no suggestion as to the work which the plaintiff may or may not perform in keeping with her complete physical condition. (P. 213)

In concluding and completing the medical phase of the record, Dr. David E. Schooley submitted his report of February 25, 1969 (p. 234) in which he advised that he had been seeing the plaintiff intermittently and over a continuous period since May 15, 1964, that she was unable to assume regular employment since September 1967, that she was and is suffering from allergic tracheobronchitis with depression, migraine headaches and an arthritic condition which has become "progressively more disabling" limiting the plaintiff to only "menial tasks" and continued medication from which "she does not derive enough relief to enable her to function efficiently in gainful employment". He last saw the plaintiff, prior to the report of February 25, 1969, on February 24, 1969. (P. 234) Dr. Schooley's report and conclusions contemplate the plaintiff's entire physical condition as a whole, including the chest condition and all its ramifications, including coughing, wheezing, shortness of breath, pulmonary emphysema, etc., including the effects of the arthritic condition and the plaintiff's "depression", "migraine headaches", etc.

Dr. Whitehill, who concerned himself with the plaintiff's arthritic condition, referred to it as "minimum", but, as it affects her ability to perform substantial employment, stated "therefore I do not feel she should do any typing *or anything* that may cause her discomfort with her hands". (P. 235)

In reviewing the medical evidence, the examiner refers to the report of Dr. Robert E. Rawdon, who made the allergy tests and who recommended that the plaintiff purchase cosmetics not containing orris root as an ingredient. (P. 17) Apparently, the examiner concluded that the plaintiff was allergic only to cosmetics worn by herself and that with orris root eliminated as an ingredient, she would have no further allergies to cosmetics. If this be the examiner's conclusion as to the effect of Dr. Rawdon's testimony, it is not borne out by the record in that the list of allergies as contained in the record (p. 179) does not refer to "orris root" as an ingredient as to which plaintiff is allergic. It is unlisted. Therefore, it cannot be concluded, based upon the record, that the elimination of orris root from plaintiff's cosmetics would eliminate her allergy. Moreover, there is nothing in the record from a medical standpoint, to establish that the plaintiff is not allergic, as she vehemently contends, to the cosmetics and perfumes worn by others to whose company she would necessarily be subjected and in whose presence she would necessarily be placed in connection with any employment whatsoever. It is unrealistic to assume, as is implied in the sarcastic exchange found at pages 72 and 73 of the record, that the job of "library catalouger" is one which does not subject the plaintiff to the company of others, including the cosmetics and perfume worn by them. Moreover, even if there is, contrary to fact, one such "lonely" job involving no contact with any other individual, the existence of such job somewhere would not disqualify the plaintiff from disability benefits. In any event, the existence of such job in the area in which the plaintiff lives and in accessible surrounding areas has not been demonstrated in this record.

Thus, it is evident that the findings and conclusions of the examiner are based almost entirely upon the testimony of the vocational expert, George Stauffer, Jr., who appeared and testified at the hearing held before the examiner.

(P. 97 et seq.) He was asked to assume a "minimal to mild" osteoarthritis. (P. 99) While Dr. Whitehill referred to "minimum osteoarthritis" and while this may have justified the examiner's characterization of the condition as "minimal to mild", there is nothing in the record to indicate that the vocational expert was aware of the limitations placed upon the plaintiff's ability to work when he, Dr. Whitehill, said "I do not feel she should do any typing *or anything* that may cause her *discomfort* with her hands". (P. 235) Dr. Whitehill's report was offered in evidence by plaintiff's counsel at the time of the hearing. There is nothing in the record to indicate that it was shown to the vocational expert or that he was aware of the express limitations placed upon the plaintiff's abilities by Dr. Whitehill. On the contrary, the vocational expert was asked to assume a "minimal to mild" osteoarthritic condition without specifics as to its effects upon the plaintiff's abilities as expressly stated by Dr. Whitehill. For this reason alone, the opinion and testimony of the vocational expert appears to have been based upon incomplete facts, including, but not necessarily limited to, his lack of knowledge as to the express limitations stated by Dr. Whitehill.

Additionally, the vocational expert was asked to assume that the plaintiff would have to work in "non-allergic atmosphere". It was not suggested to him that plaintiff was allergic to cosmetics, perfumes, etc. worn by others. Here again, his assumptions on direct examination, as delineated by the examiner, were incomplete as disclosed by the record as a whole. His suggestion that the plaintiff is able to perform the work of a receptionist in a physician's office, a dentist's office, hospital or college, or that she could perform the work of a bookkeeping machine operator or posting machine operator in a bank assumes that she has no allergy with respect to other individuals and particularly to cosmetics, etc. worn by them. Moreover, his suggestion that she could perform

as a machine operator in any location overlooks the limitations placed upon the plaintiff by Dr. Whitehill in that she should not do "any typing *or anything* that may cause her discomfort with her hands". The vocational expert conceded that based upon appearance and age only, the plaintiff would be placed in the top one-third of any employment list, but that given a "long history of illnesses" her chances of employment would be diminished. (P. 103) That is precisely this case—"a long history of illnesses". Thus her opportunity for employment is at least diminished even according to the testimony of the vocational expert upon whose conclusions the examiner's findings must necessarily be predicated.

The difficulties in asking the vocational expert to assume less physical restrictions than exist of record became the subject of an extended cross-examination by plaintiff's counsel. We quote therefrom as follows from pages 116–128 (emphasis ours):

"Q. But would her coughing spells be detrimental to a physician's office or the dental office?

EXAMINER: In other words, is the reverse of that, the fact that she does have this coughing perhaps be upsetting to others in the waiting room or might be coming for treatment, is that what you're saying?

A. Yes.

Q. Then, Doctor, wouldn't you feel that a particular doctor or a dentist would be hesitant to hire someone with this disability?

A. I think this might go back when the hearing examiner asked to put her employability, as I remember, into the upper third, middle third, and lower third. Now, if she does a great deal of coughing, or did a great deal of coughing, *I think this would be certainly a factor as far as employment is concerned.*

Q. I believe the examiner did say that she was subject to asthmatic attacks and there is no question about it that she has this condition.

A. That's right excepting that this *coughing was not spelled out* and I don't make medical judgments.

Q. You've heard the testimony of the witnesses here, the claimant herself, and you've heard her cough while she's been here, don't you feel that even as a Dean of Admissions that you wouldn't want anyone in your office that would cough as frequent as the claimant,

A. Certainly it would be no asset.

Q. And wouldn't the same thing apply to a sales clerk position?

A. Again, I think as a matter of the severity and the duration in the number of times that this happens.

Q. You said that she would be available to do the work in an attorney's office. What type of work do you feel she would be able to do there?

A. I thought as a file clerk or general clerk.

EXAMINER: This would not be true in small towns, it might be true in Pittsburgh, New York or Chicago, but the small towns would not have that.

Q. You also stated that she could be a waitress.

A. Yes.

Q. A waitress handles food, does she not?

A. Yes.

Q. A person that coughs could not possibly be a food handler, could they, Doctor?

A. *It would not be very appetizing.*

Q. You must agree that you are probably wrong.

A. No, again, some way or another, someone would have to define for

me *how often she coughs, how long she coughs and the severity of the coughing.*

Q. If a person coughed even three times an hour, wouldn't that be sufficient to prevent them from handling food, Doctor?

A. Well, you know during the winter months and so forth, waitresses get colds, too, and cough.

Q. They don't come out to work then, Doctor, when they have colds, is that right?

A. I don't know about that.

Q. Doctor, put yourself in a position of a customer, would you like a waitress to possibly hacking behind your back while she is taking an order?

A. Again, all I can say, *I don't think it would be an asset.*

Q. Doctor, would you like a waitress to serve you hot soup while having a coughing spell?

A. *No, I don't think so.*

Q. Doctor, would you like a person who has coughing spells to handle food and be a food checker?

A. I am assuming you are talking about a very severe coughing condition, and so to answer that, *no, I don't think*

Q. The same thing would be true with a nurse's aide or a hospital attendant, would that be not so, Doctor?

A. Again, depending upon its duration and the severity.

\*    \*    \*    \*    \*    \*

Q. If a person were to cough, that would even disrupt people in libraries, would it not? She's used the expression of even dropping a pin in a library is disrupting.

A. I think we were talking this afternoon, we talked about a library catalouger *who works away from the rest of the library*, receiving new books, catalouging them, arranging for them to be put on a shelf, or taking volumes that come in for one reason or another, be put in certain sections of the library, but not necessarily come in contact with other people.

Q. Don't they have to come into the library and do their work? They do their work in a library, don't they?

A. Sure.

Q. They not only do the job as a catalouger but they assist in the general library work do they not?

A. Depending upon the size of the library.

Q. Doctor, in other words, there are very few employers that would be willing to hire a woman with the claimant's impairments, would you say that would be a true statement, Doctor?

A. I would think that the chronic cough occurring with great frequency *would be a liability as far as employment is concerned.*

Q. You answered that—

EXAMINER: I'm not asking you to answer, I'd like to hear his answer. The question was—in your opinion, would there be very few employers who would hire the claimant with the claimant's impairments?

A. We are assuming that the cough is an impairment?

EXAMINER: I want an answer to his question because I think it demands an answer, and the answer could be yes or no, and then we could explain it. You've got to answer it one way or the other, then you can give your reason. You know the question?

A. *I know the question but I don't know what I'm answering, to tell the honest truth.*

EXAMINER: You're answering the question. The question is, in your opinion, would there be very

few employers who would hire the claimant with her impairment? You can answer yes or no and then give your reasons.

A. What's the impairment, this is what I'm hung up on? What are we talking about?"

(See pages 116 to 122 inclusive.)

Basically, the examiner finally conceded that if the potential employer were "reaching the bottom" of the barrel, the plaintiff would be hired.

"Q. If you're reaching the bottom, you might scrape it and hire anyone, is that what you are saying?

A. *That's exactly it.*"

(See page 124)

We further quote from the testimony of said vocational expert:

"Q. Then, Doctor, in the area of Mt. Union, you don't have any idea as to what reasonable opportunities there would be for this claimant?

A. Not right in Mt. Union.

Q. Mt. Union area I'm talking about.

A. I was born across the mountains, lived there.

Q. Where is that?

A. Chambersburg.

&ast;　&ast;　&ast;　&ast;　&ast;　&ast;

Q. If this person, Doctor, would get more severe attacks by being among people, would that change your answer in any respect?

A. Of course if this increased the severity, the duration, this would undoubtedly be a factor."

(See pages 125, 127, 128.)

The incomplete assumptions upon which the vocational expert's opinion was based on direct examination were responsible for the very relevant and material concessions which he was obliged to make on cross-examination. Therefore, we are obliged to conclude that the testimony of the vocational expert, read in its entirety, does not support the findings and conclusions of the examiner as affirmed by the Appeals Council in denying the plaintiff's request for review. The medical reports of record considered individually or collectively do not support the examiner's conclusions as adopted and affirmed by the Appeals Council. The examiner's decision was here dated April 24, 1969, and the final decision by the Appeals Council was dated May 26, 1969, prior to the decision of the Court in Bittel v. Richardson, Secretary of Health, Education and Welfare, 441 F.2d 1193 (3rd Cir. 1971), argued March 4, 1971, and decided May 14, 1971. The Court there stated at page 1195:

" * * * Furthermore, it should be noted that Mrs. Bittel complained of several physical impairments other than congestive heart failure. Since the Secretary must evaluate the evidence in relation to the particular individual seeking benefits, where there are several illnesses suffered simultaneously by the claimant, the *combined effect* of the impairment must be considered before the Secretary denies the payment of disability benefits. Dillon v. Celebrezze, 345 F.2d 753, 755–757 (4th Cir. 1965).

"Physical impairment is defined by the Act as that which is 'demonstrable by medically acceptable clinical and laboratory diagnostic techniques'. *Thus, Congress chose not to limit to laboratory techniques and evaluations the kind of evidence which may support a claim of disability, but instead adopted a broader standard encompassing all medical techniques.* And as was stated in Ber v. Celebrezze, supra [2 Cir.], 332 F.2d [293] at 299: ' * * * inasmuch as the applicable section of the Social Security Act requires a showing of a medically determinable physical or mental impairment, *even pain unaccompanied by objectively observable symptoms which is nevertheless real to the sufferer and so intense as to be disabling will support a claim for disability benefits.*' Likewise the Fourth Circuit in Dillon v. Celebrezze, 345 F.2d 753, 755 (4th

Cir. 1965) pointed out that *subjective* evidence of the claimant's pain and disability *is one of the elements* of proving a qualification for benefits under the Act. Compare Martin v. Finch, 415 F.2d 793 (5th Cir. 1969)." (Emphasis ours)

Therefore, considering the *record as a whole,* as we are obliged to do, we are compelled to conclude that the examiner's conclusions as adopted and affirmed by the Appeals Council are not supported by substantial evidence.

As was said in Klimaszewski v. Flemming, *supra,* 176 F.Supp. at 931:

"* * * However, the definition of disability cannot be considered in vacuo. The definition relates to the individual claimant. 'The act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment upon that person, with whatever abilities or inabilities he has'. Dunn v. Folsom, D.C.W.D.Ark. 1958, 166 F.Supp. 44, 48."

This case is not unlike the case of Stancavage v. Celebrezze, *supra,* where, in reversing and remanding the record, the Court said as follows, 323 F.2d at page 378:

"* * * There must be something (more) tangible establishing what employment opportunities there are for a man with his impairment. The failure of the Secretary to establish the existence of that kind of genuine employment opportunity is patent. And it must be presumed that the best available proof on this has been presented. That proof is unacceptable under Hodgson."

In the case of Bujnovsky v. Celebrezze, 343 F.2d 868, (3rd Cir. 1965), as here, plaintiff suffered from emphysema. Understandably, his complaints and symptoms were similar. Although he looked after his personal needs, he did only small chores and took short walks. He suffered from shortness of breath, coughing, weakness, pains in the chest,

and fatigue. There, as here, there was medical testimony that he was totally disabled. At page 871, the Court stated: "* * * We agree with the district court that the plaintiff has adduced sufficient evidence to put the burden upon the Secretary to show that a reasonable employment opportunity is available to him (the plaintiff)." In affirming the order of the District Court granting the plaintiff's motion for summary judgment, the Court reiterated that the words "substantial gainful activity" must be read in the light of "what is reasonably possible and not what is conceivable * * *. Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available * * *". (See p. 870).

The facts here involved, as they concerned the vocational expert, are not substantially unlike those in Bosche v. Secretary of Health, Education and Welfare, D.C., 326 F.Supp. 733 in which this Court granted plaintiff's motion for summary judgment.

Plaintiff's motion for summary judgment will be granted. Defendant's motion for summary judgment will be denied.